RONALD GOLD, INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED *v.*
JOHN G. ROWLAND ET AL.
(SC 17854)

Norcott, Palmer, Vertefeuille, Schaller, Sullivan, McLachlan and Alvord, Js.*

* This case originally was argued before a panel of this court consisting
of Justices Norcott, Palmer, Vertefeuille, Schaller and Sullivan. Thereafter,
the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that
the case be considered en banc. Accordingly, Justice McLachlan and Judge
Alvord were added to the panel, and they have read the record, briefs and
transcript of oral argument.

The listing of the justices reflects their seniority status as of the date of
oral argument.

Argued November 20, 2008—officially released May 11, 2010

*Linda L. Morkan,* with whom were *Marion B. Manzo* and, on the brief, *Frank F. Coulom, Jr., Richard F. Vitarelli* and *Andrea Donovan Napp,* for the appellants-cross appellees (named defendant and defendant state of Connecticut).

*Elizabeth J. Robbin Greenspan,* with whom was *Matthew T. Wax-Krell* for the appellee-cross appellant (plaintiff).

*Charles L. Howard*, with whom was *Sheila A. Huddleston* for the appellee-cross appellants (defendants Anthem, Inc., et al.).

*Opinion*

SULLIVAN, J. The plaintiff, Ronald Gold, a state employee, brought this action on his own behalf and on behalf of all others similarly situated, against the defendants, John G. Rowland, the former governor of the state of Connecticut, and the state of Connecticut (collectively referred to as the state), and also against Anthem, Inc., Anthem Health Care Plans, Inc., doing business as Anthem Blue Cross and Blue Shield of Connecticut, Anthem East, Inc., and Anthem Insurance Companies, Inc. (collectively referred to as the insurance company defendants), alleging that the state had received approximately 1.6 million shares of stock in Anthem, Inc., that should have been distributed to the plaintiff and other state employees. The state filed a motion to dismiss the complaint on the ground that it was barred by the doctrine of sovereign immunity. The trial court granted the state's motion to dismiss with respect to eleven of the complaint's seventeen counts against the state, but denied the motion with respect to the counts alleging that the state had taken the plaintiff's property in violation of article first, § 11, of the constitution of Connecticut[1] and had violated his due process rights under article first, § 8, of the constitution of Connecticut.[2] The trial court also denied the motion to dismiss the plaintiff's interpleader claims under General

[1] Article first, § 11, of the constitution of Connecticut provides: "The property of no person shall be taken for public use, without just compensation therefor."

[2] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Statutes § 52-484.[3] The state then appealed,[4] claiming that the trial court improperly had denied its motion to dismiss the counts alleging constitutional violations. The insurance company defendants filed a cross appeal claiming that the trial court improperly had concluded that the plaintiff did not have a colorable claim of an unconstitutional taking under a theory of individual entitlement and that the trial court improperly had dismissed the plaintiff's constructive trust claims. The plaintiff also filed a cross appeal claiming that the trial court improperly had granted the state's motion to dismiss with respect to his constructive trust and resulting trust claims.[5] With respect to the state's appeal, we conclude that the trial court improperly denied the state's motion to dismiss the plaintiff's claims under the state constitution. With respect to the insurance company defendants' cross appeal, we conclude that they lack standing to raise their claims. Finally, with respect to the plaintiff's cross appeal, we conclude that

---

[3] General Statutes § 52-484 provides: "Whenever any person has, or is alleged to have, any money or other property in his possession which is claimed by two or more persons, either he, or any of the persons claiming the same, may bring a complaint in equity, in the nature of a bill of interpleader, to any court which by law has equitable jurisdiction of the parties and amount in controversy, making all persons parties who claim to be entitled to or interested in such money or other property. Such court shall hear and determine all questions which may arise in the case, may tax costs at its discretion and, under the rules applicable to an action of interpleader, may allow to one or more of the parties a reasonable sum or sums for counsel fees and disbursements, payable out of such fund or property; but no such allowance shall be made unless it has been claimed by the party in his complaint or answer."

[4] The state appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. See *Shay* v. *Rossi*, 253 Conn. 134, 167, 749 A.2d 1147 (2000) (denial of motion to dismiss on basis of sovereign immunity is immediately appealable final judgment), overruled on other grounds by *Miller* v. *Egan*, 265 Conn. 301, 327, 828 A.2d 549 (2003).

[5] The plaintiff and the insurance company defendants obtained permission to cross appeal from the trial court's partial judgment pursuant to Practice Book § 61-4.

the trial court properly dismissed the plaintiff's claims of a constructive trust and a resulting trust.[6] Accordingly, we reverse in part and affirm in part the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. On July 31, 1997, Anthem Insurance Companies, Inc. (Anthem Insurance), a mutual insurance company organized under Indiana law, merged with Blue Cross and Blue Shield of Connecticut, Inc. (Blue Cross), a mutual insurance company organized under Connecticut law. Under the plan and joint agreement of merger, Anthem Insurance was designated as the company that would survive the merger. In connection with the merger, Blue Cross formed a subsidiary, Anthem Health Care Plans, Inc., doing business as Anthem Blue Cross and Blue Shield of Connecticut (Anthem Health Care), to carry on the health insurance business of Blue Cross after the merger.

Under Anthem Insurance's premerger membership rules, each individual holder of a certificate of coverage under a fully insured group health insurance policy was an individual member of the company. The employer that had procured the coverage was not a member. Blue Cross' premerger bylaws provided in relevant part that, "[i]n the case of a group insurance policy, the group as a whole shall be considered one policyholder, and such policyholder's rights as a [v]oting [m]ember shall be exercised by the individual designated in, or pursuant to, such policy to act for the group for voting purposes. Individual members of the group who have been issued certificates shall not be considered [v]oting [m]embers. . . ." On March 26, 1997, Blue Cross designated an entity identified as "00042-243, [s]tate of Connecticut, [o]ffice of [c]omptroller, 55 Elm Street, Hartford, CT

---

[6] The plaintiff's claims against the insurance company defendants are not at issue in this appeal and the cross appeals.

06106" as the voting member for a group health insurance policy, known as the care plus policy, issued by Blue Cross for 571 retired state employees.

On June 18, 2001, the board of directors of Anthem Insurance approved a plan of conversion from a mutual insurance company to a stock corporation (plan of conversion) under Indiana law.[7] The Indiana insurance commissioner approved the plan of conversion with an effective date of November 2, 2001. Thereafter, Anthem, Inc., was organized as a stock corporation under Indiana law to be the parent corporation of Anthem Insurance. Under the plan of conversion, upon the effective date of the demutualization, all of the outstanding capital stock of Anthem Insurance would be issued to Anthem, Inc., and "[e]ligible [s]tatutory [m]ember[s]"[8] of Anthem Insurance would become entitled to receive stock in Anthem, Inc., or cash, in exchange for the extinguishment of their membership interests in Anthem Insurance. The plan of conversion defined "[e]ligible [s]tatutory [m]ember" as "a [p]erson who (a) is a [s]tatutory [m]ember of Anthem Insurance on the [a]doption [d]ate [i.e., June 18, 2001] and continues to be a [s]tatutory [m]ember of Anthem Insurance on the [e]ffective [d]ate [i.e., November 2, 2001], and (b) has had continuous health care benefits coverage with the same company during the period between those two dates under any [p]olicy or [p]olicies without a break

---

[7] Mutual insurance companies are owned by their members, who are also insureds. See R. Keeton, Insurance Law (1971) § 1.4, p. 20. Stock insurance companies are owned by stockholders. Id.

[8] Under Indiana law, " '[e]ligible member' " is defined as a person who "(1) is a member of the converting mutual on the date the converting mutual's board of directors adopts a resolution proposing a plan of conversion and an amendment to the articles of incorporation; and (2) continues to be a member of the converting mutual on the effective date of the conversion." Ind. Code Ann. § 27-15-1-7 (LexisNexis 2009). Indiana law defines " '[m]ember' " as "a person that, according to the: (1) records; (2) articles of incorporation; and (3) bylaws; of a converting mutual, is a member of the converting mutual." Ind. Code Ann. § 27-15-1-9 (LexisNexis 2009).

of more than one day." During the period from June 18, 2001, through November 2, 2001, the plaintiff and other state employees and retirees continuously held certificates of coverage under a group policy that the state had procured from Anthem Health Care in 1999 (1999 group policy).

In late 2001 and early 2002, Anthem Insurance distributed 1,645,773 shares of Anthem, Inc., stock to the state, on the basis of its determination that the state was an eligible statutory member under the 1999 group policy. On January 14, 2002, Nancy Wyman, the state comptroller, sent a letter to then governor John G. Rowland requesting the establishment of a "fiduciary agency fund" for the stock and any proceeds derived therefrom. Wyman explained that "the state has taken custody of an asset to which it does not have a clear and unfettered right of ownership" and asked that the stock and proceeds be maintained in the fund "pending the resolution of all ownership issues." Governor Rowland approved the establishment of the fund. Thereafter, Attorney General Richard Blumenthal provided an opinion to the state treasurer in which he concluded that the state owned the Anthem, Inc., stock and that, "[u]nless and until a court or administrative tribunal directs otherwise, [the treasurer] ha[s] the authority to receive and manage the stock consistent with [her] statutory and fiduciary duties." He further stated that, "[a]s a prudential matter, the proceeds from the liquidation of the stock may be maintained in [the fiduciary agency] fund until the legal issues are resolved." Thereafter, the state sold the stock for $93,768,950.

In January, 2002, the plaintiff filed a two count interpleader action against the state and the insurance company defendants alleging that he and others similarly situated were entitled to receive the Anthem, Inc., stock pursuant to the plan of conversion. In April, 2002, the plaintiff filed a motion for order compelling the state

and the insurance company defendants to deposit the proceeds from the sale of the stock into the court. The trial court declined to rule on the motion, but issued a scheduling order in which it ordered that all "funds received for the sale of stock received from the [insurance company defendants] . . . shall remain sequestered until such time as this court shall determine the legality of so holding them, the necessity thereof to preserve the plaintiff's interest in satisfying any judgment that may be entered in his favor in this case, and any other matter the parties may raise as to the appropriateness of their continuing sequestration."

In May, 2002, the parties entered into a stipulation in which they noted that the trial court had entered "an interim order . . . solely to preserve the status quo pending its determination of the [m]otion [for order compelling the state and the insurance company defendants to deposit disputed property into court]." They agreed that "[a]ny transfer or use by the [s]tate of some or all of the proceeds [from the sale of the Anthem, Inc., stock] shall not result in the surrender, waiver, change, diminution or loss of any rights or claims of right or the enhancement of any defense of any party by virtue of such transfer or use as they may have existed or shall exist any time hereafter." The trial court then vacated the interim order. Effective July 1, 2002, the legislature authorized the state treasurer to credit the proceeds from the sale of the stock held in the fiduciary agency fund to the general fund. See Public Acts, Spec. Sess., May, 2002, No. 02-1, § 39. Thereafter, the state transferred the proceeds to the general fund and spent them.

In November, 2002, the plaintiff filed a second amended complaint in which he raised interpleader claims pursuant to § 52-484 alleging that, under the plan of conversion, he and other similarly situated state employees were entitled to the stock that the insurance

company defendants had issued to the state (counts one and two). In addition, the plaintiff claimed that: the state had been unjustly enriched by receipt of the Anthem, Inc., stock (counts three and four); the state held the stock or its cash equivalent in constructive trust for the plaintiff and others similarly situated (counts five and six); the state held the stock or its cash equivalent in resulting trust for the plaintiff and others similarly situated (count seven); the state had converted property rightfully owned by the plaintiff and others similarly situated (counts eight and nine); the state had failed to compensate the plaintiff and others similarly situated for the taking of the stock in violation of article first, § 11, of the constitution of Connecticut (counts ten and eleven); the state had taken the stock without providing due notice of the taking to the plaintiff and others similarly situated and without affording them the right to a hearing or other process in violation of article first, § 8, of the constitution of Connecticut (counts twelve and thirteen); the state had failed to compensate the plaintiff and others similarly situated for the taking of the stock in violation of the fifth and fourteenth amendments to the United States constitution[9] and they were therefore entitled to compensation under 42 U.S.C. § 1983[10] (counts fourteen and fifteen);

[9] The fifth amendment to the United States constitution provides in relevant part: "[N]or shall private property be taken for public use, without just compensation." The takings clause of the fifth amendment is made applicable to the states through the fourteenth amendment. See *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U.S. 155, 160, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980); *Pennsylvania Central Transportation Co.* v. *New York City*, 438 U.S. 104, 122, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978).

[10] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

the state had taken the stock without providing due notice of the taking to the plaintiff and others similarly situated and without affording them the right to a hearing or other process in violation of the fifth and fourteenth amendments to the United States constitution[11] and they were therefore entitled to compensation under 42 U.S.C. § 1983 (counts sixteen and seventeen); and the insurance company defendants had breached their duties to the plaintiff and others similarly situated by failing to issue the stock or its cash equivalent to them (counts eighteen and nineteen).

Thereafter, the state filed a motion to dismiss the plaintiff's claims against it on the ground that the claims were barred by the doctrine of sovereign immunity. After a hearing, the trial court concluded that the common-law claims raised in counts three through nine of the complaint were barred by the doctrine of sovereign immunity and dismissed those counts. The court also dismissed the plaintiff's federal constitutional claims as set forth in counts fourteen through seventeen on the basis of the plaintiff's representation that he did not intend to pursue those claims.

With respect to the plaintiff's claims under the state constitution, the state had claimed in its motion to dismiss that the complaint did not set forth allegations that could support a finding that the state had taken the plaintiff's property in a constitutional sense because the plaintiff had not alleged that the state had taken affirmative action with respect to the stock or the proceeds from its sale. Rather, the state argued, the plaintiff had merely alleged that the state had received the stock from Anthem, Inc. The state further contended that the

---

[11] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." Section 1 of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

plaintiff had alleged only that he was entitled to receive generic stock or cash from Anthem, Inc., not that he was entitled to the specific stock that had been delivered to the state. Because the plaintiff was entitled to bring a contractual claim against Anthem, Inc., for delivery of the stock or its cash equivalent, the state argued, the state's receipt of the stock had not deprived the plaintiff of anything. The trial court rejected these claims and agreed with the plaintiff that, because he had alleged that the stock that the state had received from Anthem Insurance belonged exclusively to him and to others similarly situated, the state's physical retention of the property could constitute a taking.

The state had also claimed that, even if its mere retention of the stock could constitute a constitutional taking, the plaintiff had not alleged a taking because he had not alleged that he and others similarly situated had an ownership interest in the stock at the time of the alleged taking. The plaintiff contended that, to the contrary, he and others similarly situated had a legitimate entitlement to the stock in the state's possession because: (1) as individual holders of certificates of insurance under the 1999 group policy from June 18, 2001, through November 2, 2001, he and those on whose behalf he was suing all had been eligible statutory members of Anthem Insurance and, therefore, under the express provisions of the plan of conversion, they were individually entitled to receive personal distributions of stock or its cash equivalent from Anthem, Inc.; and (2) alternatively, under Blue Cross' premerger bylaws, he and others similarly situated, as a "group as a whole," had been the sole policyholder and, upon the merger of Anthem Insurance and Blue Cross and the subsequent demutualization of Anthem Insurance, the group as a whole became the eligible statutory member with the state as its voting representative.[12]

---

[12] The plaintiff's two theories of entitlement to the Anthem, Inc., stock involve extremely complex factual and legal issues arising from the treat-

With respect to the plaintiff's first theory of entitle-
ment, the trial court concluded that, even if the plaintiff
and others similarly situated were individually entitled
to receive the stock, the state had done nothing to
interfere with that right and, therefore, its conduct
could not have constituted a taking. With respect to
the plaintiff's second group as a whole theory of entitle-
ment, the court rejected the state's argument that,
because the "only property interest asserted by the
plaintiff . . . is [his] alleged right, under the plan of
conversion, to receive an unknown quantity of [Anthem,
Inc.] stock or cash from [Anthem, Inc.] upon the demu-
tualization of Anthem Insurance," the plaintiff had not
alleged that the state had taken a discrete property
interest. In support of this claim, the state had argued
that Anthem, Inc.'s determination as to how much stock
the state was to receive necessarily would be different
from its determination as to how much stock the group
as a whole would be entitled to receive. The trial court
concluded that, because, apart from a fixed component
of twenty-one shares per statutory member, the alloca-
tion of the stock was based on Anthem, Inc.'s profit and
loss experience under the relevant policy, the amount of
stock allocated to the group as a whole would have
been no different than the amount allocated to the state.
The court concluded that the plaintiff had made a color-
able claim that the group as a whole was entitled to
the stock that Anthem Insurance had delivered to the
state and that the plaintiff could establish a taking at
trial "provided only that [he] also proved that the rela-
tionship between the group as a whole and the state
. . . was that of principal and agent." (Internal quota-
tion marks omitted.) Accordingly, the trial court denied

---

ment of the 1999 group policy and the care plus policy under the plan of
conversion. Because of the complexity of those issues, and because the
trial court's conclusion that the plaintiff had made colorable claims under
both theories is not at issue in this appeal, there is no need to explain the
theories in detail here.

the state's motion to dismiss the plaintiff's claim of an unconstitutional taking under the state constitution under his group as a whole theory.

With respect to the plaintiff's due process claims under the state constitution, the trial court concluded that, in light of the plaintiff's valid claim of an unconstitutional taking, the plaintiff had made a colorable claim that he and others similarly situated were constitutionally entitled to procedures to ensure that they were aware of their rights to the stock, if any, or to a posttaking hearing to determine the amount of compensation that they should receive for the stock. Accordingly, the court denied the motion to dismiss these claims.

Finally, with respect to the plaintiff's interpleader claims under § 52-484, the trial court concluded that the claims were "merely procedural vehicles for obtaining a final judicial determination as to who owns the disputed stock and stock sales proceeds, and thus . . . their viability depends upon the viability of at least one of his other, substantive claims." Because the plaintiff had raised viable substantive claims under the state constitution, the court denied the motion to dismiss with respect to the interpleader claims.

This appeal by the state and these cross appeals by the plaintiff and the insurance company defendants followed. See footnotes 4 and 5 of this opinion. The state claims on appeal that the trial court improperly denied its motion to dismiss the plaintiff's claim of an unconstitutional taking under the state constitution because: (1) the plaintiff had not alleged any agency relationship between the state and the plaintiff and others similarly situated in their capacity as a group as a whole under Blue Cross' premerger bylaws; (2) the property held by the state is not identical to the property to which the plaintiff claims an entitlement; (3) the state's passive receipt of property under a claim of right cannot consti-

tute an unconstitutional taking; and (4) the plaintiff was required to exhaust his remedies with the claims commissioner pursuant to General Statutes § 4-142 et seq., before bringing his takings claim. The plaintiff disputes these claims by the state and cross appeals from the trial court's dismissal of his claims alleging a constructive trust and a resulting trust. The insurance company defendants also dispute the state's claims on appeal and cross appeal from the trial court's determination that the plaintiff had not raised a colorable claim of an unconstitutional taking under his individual theory of entitlement, as well as from that court's dismissal of the plaintiff's constructive trust claims.

I

## THE STATE'S APPEAL

We first address the state's claim on appeal that the plaintiff neither alleged nor presented evidence that the state had received the Anthem, Inc., stock in its capacity as agent for the plaintiff and others similarly situated. We agree.[13]

We begin our analysis with the appropriate standard of review. "The standard of review for a court's decision on a motion to dismiss is well settled. A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo. . . . When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable

---

[13] Accordingly, we need not consider its other claims on appeal.

to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." (Citation omitted; internal quotation marks omitted.) *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 516, 923 A.2d 638 (2007). "The complaint, to survive the defense of sovereign immunity, must allege sufficient facts to support a finding of a taking of [property] in a constitutional sense . . . ."[14] *Horak* v. *State*, 171 Conn. 257, 261, 368 A.2d 155 (1976).

In the present case, the trial court concluded that the plaintiff could prevail on his claim of an unconstitutional taking if he could establish at trial that the state had acted as his agent when it received the Anthem, Inc., stock. In support of this conclusion, the trial court stated that, if the plaintiff were able to establish at trial that the group as a whole had "received collective membership rights in Anthem Insurance pursuant to [the care plus policy], including the right to receive a single joint distribution of stock or cash from [Anthem, Inc.] upon the demutualization of Anthem Insurance . . . then the plaintiff and his fellow class members would have established that their group as a whole was collectively entitled to receive all of the stock which [Anthem, Inc.] delivered to the state in exchange for the state's assumed membership rights in Anthem Insurance pursuant to the care plus policy and the 1999 group policy, provided only that they also proved that the

---

[14] "The word taken as used in . . . article first, § 11, of the Connecticut constitution means generally the exclusion of the owner from his private use and possession, and the assumption of the use and possession for the public purpose by the authority exercising the right of eminent domain." (Internal quotation marks omitted.) *Horak* v. *State*, 171 Conn. 257, 261, 368 A.2d 155 (1976). "An inverse condemnation claim accrues when the purpose of government [action] and its economic effect on the property owner render the [action] substantially equivalent to an eminent domain proceeding." (Internal quotation marks omitted.) *Rural Water Co.* v. *Zoning Board of Appeals*, 287 Conn. 282, 298, 947 A.2d 944 (2008).

relationship between the group as a whole and the state with respect to those policies was that of principal and agent. In that event, the state's receipt of the disputed stock would not have been in its personal capacity, in its own right or for its own benefit, but in its representative capacity, as the statutory member of Anthem Insurance on behalf of and for the benefit of the group as a whole. If such facts are proved at trial, then the state's sale of the disputed stock and continuing retention of all proceeds from its sale for its own use would clearly constitute a taking, in the constitutional sense, of the plaintiff's and his fellow class members' private property."[15] (Internal quotation marks omitted.)

According to the trial court, this theory was in contrast to the plaintiff's individual theory of entitlement, under which the plaintiff and others similarly situated "would logically have expected that such distributions would be made to them directly, not through the state or any other third party intermediary." Thus, the trial court's conclusion that the plaintiff could prevail under his group as a whole theory if he could establish an agency relationship between himself and the state was premised on that court's determination that, under the

---

[15] "Generally, an agent is under a duty to repay or deliver to the principal money or property belonging to the principal which comes into the agent's hands . . . while conducting the business of the agency, and an action will lie at the instance of the principal to recover such money." 3 Am. Jur. 2d 689–90, Agency § 322 (2002). In such cases, the principal has an action for "money had and received," which is the equivalent of the more modern action for unjust enrichment. See id., 690 n.1; 66 Am. Jur. 2d 747, Restitution and Implied Contracts § 172 (2001). Given these principles, it is not entirely clear to us why the trial court, having concluded that the plaintiff's claims against the state for unjust enrichment were barred by the doctrine of sovereign immunity, concluded that the plaintiff's claim that the state had received the stock as the agent for the group as a whole was not barred but, rather, constituted a colorable taking claim. We need not resolve this issue, however, because we agree with the state that the plaintiff has not made a colorable claim that the state received the stock in its capacity as the agent for the group as a whole.

group as a whole theory, unlike the plaintiff's individual theory of entitlement, the plaintiff and others similarly situated logically would have expected to receive a single joint distribution of stock rather than individual distributions.

The state contends that the trial court improperly concluded that the plaintiff could prevail on his claim of an unconstitutional taking at trial if he could prove that the state received the stock in its capacity as an agent for the plaintiff and others similarly situated because the plaintiff did not allege that he and others similarly situated had an agency relationship with the state. Specifically, the state claims that the plaintiff failed to allege any facts capable of establishing a manifestation of his assent that the state would act on his behalf, any facts capable of establishing that the state agreed to receive the stock on his behalf or any facts capable of establishing that the parties understood that the plaintiff ultimately would be in control of the stock.[16] The plaintiff responds that the trial court properly held that the issue of representative capacity was a question of fact to be determined at trial and that the plaintiff was not required to prove an agency relationship at this stage of the proceedings. We agree with the state.

The plaintiff neither alleged in his complaint nor presented any evidence to the trial court that Anthem Insurance in fact delivered the stock to the state in its

---

[16] "Under § 1 of 1 Restatement (Second) of Agency (1958), [a]gency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act . . . . Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. . . . The existence of an agency relationship is a question of fact." (Internal quotation marks omitted.) *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 543, 893 A.2d 389 (2006).

capacity as the agent for the group as a whole. Rather, the plaintiff's complaint more reasonably is read as alleging that Anthem Insurance *failed* to deliver the stock to the state in its capacity as the agent for the group as a whole, in violation of Anthem Insurance's obligations under the plan of conversion.[17] Indeed, the plaintiff does not dispute that Anthem Insurance determined that the state was entitled to the stock as a statutory member in its own right and that the plaintiff and others similarly situated were *not* statutory members and were *not* entitled to the stock. Nor does he dispute that Anthem Insurance delivered the stock to the state in its capacity as a statutory member in its own right. See footnote 17 of this opinion. He claims only that these actions violated the plan of conversion.

Thus, although the trial court may have been correct that the plaintiff had made a colorable claim that the group as a whole was entitled to the stock, and that the plaintiff had a reasonable expectation under the plan of conversion that Anthem Insurance would deliver a single, joint distribution of the stock to the group and that the state was the logical representative of the group for the purpose of receiving the stock, in the absence of any allegation that Anthem Insurance in fact delivered the stock to the state in its capacity as the agent for the plaintiff and others similarly situated, we must conclude that the trial court improperly determined that

---

[17] The plaintiff alleged in his complaint that "[t]he stock which should have been issued to [the plaintiff] and [others similarly situated] pursuant to the [p]lan of [c]onversion . . . was issued by Anthem [Insurance] to [the state] . . . ."

In his brief to this court, the plaintiff characterizes this portion of his complaint as alleging that "the stock was issued to the state *in lieu of* to the plaintiff"; (emphasis added); not that it was issued to the state on behalf of the plaintiff. The plaintiff also states in his brief that Anthem Insurance "misdelivered" the stock to the state. Neither of these characterizations of Anthem Insurance's conduct is consistent with a claim that Anthem Insurance delivered the stock to the state in its capacity as the plaintiff's agent.

the plaintiff could prove this fact at trial. See *Cogswell* v. *American Transit Ins. Co.*, supra, 282 Conn. 516 ("[t]he motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone" [internal quotation marks omitted]). Accordingly, we conclude that the trial court improperly denied the state's motion to dismiss the plaintiff's claim of an unconstitutional taking under the state constitution on this ground. Because the plaintiff's due process claims under the state constitution are premised on his taking claims, we further conclude that the trial court improperly denied the state's motion to dismiss those claims.[18]

---

[18] The plaintiff has not challenged the trial court's conclusion that he can prevail under his group as a whole theory only if he proves that the state acted as his agent when it received the stock. Rather, he argues that, if we agree with that conclusion, we should not reverse the judgment denying the state's motion to dismiss on the basis of the state's alternate claim that the state's passive retention of property that it received from a third party cannot constitute a taking. Because we conclude that the trial court improperly determined that the plaintiff could prove an agency relationship at trial, we need not address this question.

The dissent contends that, in reaching our conclusion that the plaintiff's state constitutional claims should be dismissed because he has not alleged that the insurance company defendants transferred the stock to the state in its capacity as the agent for the plaintiff and others similarly situated, we confuse the procedural vehicle of a motion to dismiss with the procedural vehicle of a motion to strike. This court previously has held, however, that, when a complaint properly would have been subject to a motion to strike, and the plaintiff has made no showing that he could amend the complaint to avoid the deficiencies of the original complaint, the granting of a motion to dismiss instead of a motion to strike is harmless error. See, e.g., *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 501–502, 815 A.2d 1188 (2003). Similarly, when a complaint properly would have been subject to a motion to strike and the plaintiff cannot cure the deficiencies in the complaint, we properly may reverse the trial court's denial of a motion to dismiss rather than remand the case to the trial court so that the defendant may file a motion to strike that the trial court would be required to grant. The dissent does not dispute that the complaint in the present case properly would have been subject to a motion to strike and, because the plaintiff has not pointed to any evidence that Anthem Insurance transferred the stock to the state in its capacity as the agent for the plaintiff and others similarly situated, we must conclude that he cannot amend the complaint to cure its deficiencies. Accordingly, we properly may reverse the trial court's ruling denying the motion to dismiss.

## II

## THE INSURANCE COMPANY DEFENDANTS' CROSS APPEAL

As we have indicated previously herein, the trial court effectively treated each count of the plaintiff's complaint alleging violations of the state constitution as two separate counts alleging separate theories of recovery and concluded that his claims under the individual theory of entitlement must be dismissed. In their cross appeal, the insurance company defendants claim that the trial court improperly dismissed those claims. They contend that, regardless of whether the state acted as an agent for the plaintiff and others similarly situated, the plaintiff raised a valid claim of an unconstitutional taking under both his individual theory of entitlement and his group as a whole theory of entitlement because, if a trier of fact ultimately were to determine that the plaintiff and other similarly situated state employees are the true owners of the stock, the state's retention of the stock or the proceeds from its sale would unconstitutionally exclude the true owners from its use and possession. Thus, the insurance company defendants challenge the trial court's conclusion that, in the

---

The dissent also places much emphasis on the evidence supporting an inference that the state was the agent for the plaintiff and others similarly situated and accuses the majority of ignoring this evidence. The dissent has pointed to no evidence, however, that the insurance company defendants transferred the stock to the state in its capacity as an agent and not in its capacity as a statutory member in its own right.

Finally, we recognize that, as the dissent points out, the insurance company defendants' subjective belief that the state was the rightful owner of the stock has no bearing on whether the state, in fact, is the rightful owner of the stock. That question will be resolved in the ongoing litigation between the plaintiff and the insurance company defendants. Neither the dissent nor the plaintiff has provided any authority, however, for the proposition that, when property had been transferred by one party to another party, the intent and beliefs of the parties have no bearing on whether the transfer was made to the transferee in its capacity as an agent for another, or in its capacity as the purported rightful owner.

absence of an agency relationship, the state could not have interfered unconstitutionally with the plaintiff's property rights. The insurance company defendants also claim that the trial court improperly dismissed the plaintiff's constructive trust and resulting trust claims on the ground that the doctrine of sovereign immunity does not bar claims for declaratory or injunctive relief. The state counters that the insurance company defendants lack standing to bring this cross appeal because the trial court's dismissal of the plaintiff's claims against the state did not affect any specific personal or legal interest of the insurance company defendants. We agree with the state.

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action . . . . Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citation omitted; internal quotation marks omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 308–309, 796 A.2d 516 (2002). "If a party is found to lack standing, the court is without subject matter jurisdiction to determine

the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 286 Conn. 264, 271, 943 A.2d 420 (2008).

The state claims that the insurance company defendants lack standing to cross appeal from the dismissal of the plaintiff's claims against the state because the insurance company defendants have raised no claims against the state. Because the plaintiff's claims against the insurance company defendants are entirely distinct from his claims against the state, the state argues, the dismissal of the plaintiff's claims against the state does not affect the insurance company defendants. In response, the insurance company defendants contend that, because the practical effect of the dismissal of the plaintiff's claims against the state is to expose the insurance company defendants to the risk of a double recovery of the value of the stock, they have a specific interest in keeping the state as a party in the case.

We recognize that, as a practical matter, permitting the plaintiff to pursue his claims against the state could reduce the insurance company defendants' risk of exposure to multiple recoveries. We also recognize that their interest in avoiding multiple recoveries against them probably would be sufficient to confer standing on them to bring a claim against the state, which are the claims at issue in the insurance company defendants' cross appeal.[19] We conclude, however, that the insurance company defendants have no legally protectible interest in the *plaintiff's* claims against the state. As the state points out, the plaintiff could have brought a claim for the stock solely against the insurance company defen-

---

[19] We express no opinion here as to the nature of any such claim, whether it would be time barred or ripe, or whether it would be barred by the doctrine of sovereign immunity.

dants and he could withdraw his claims against the state at will.[20] We conclude, therefore, that the dismissal of the plaintiff's claims against the state did not deprive the insurance company defendants of anything in which they had "a specific personal and legal interest . . . ." *Briggs* v. *McWeeny*, supra, 260 Conn. 308. Accordingly, we conclude that the insurance company defendants lack standing to bring their cross appeal from the judgment of the trial court dismissing the plaintiff's constitutional claims against the state.[21]

[20] Moreover, the plaintiff has not cross appealed from either the trial court's determination that he cannot prevail on his claim of an unconstitutional taking under his theory of individual entitlement or from that court's determination that he can prevail under his group as a whole theory only if he establishes that the state received the stock in its capacity as an agent for the plaintiff and others similarly situated. Rather, in response to the state's claims on appeal, the plaintiff has claimed only that the trial court properly determined that he need not prove an agency relationship until the time of trial, that the state's mere retention of the proceeds from the sale of the stock would constitute a taking under those circumstances and that his claim was not a contractual claim in a constitutional guise. We must presume, therefore, that the plaintiff believes that the trial court properly determined that proof of an agency relationship is a critical element of his taking claim. We have concluded that the plaintiff has not made a colorable claim that the state received the stock in its capacity as the plaintiff's agent. Thus, there is no reason to believe that the plaintiff would pursue his constitutional claims under either theory if this court were to rule in favor of the insurance company defendants on their cross appeal. Accordingly, even if the insurance company defendants had standing to raise their cross appeal from the trial court's dismissal of the constitutional claims, the appeal would be moot.

[21] The insurance company defendants' reliance on *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 602 A.2d 1019 (1992), in support of their claim to the contrary is misplaced. This court held in *Rose* that the word "party" as used in General Statutes § 1-21i (d), now General Statutes § 1-206 (d), includes intervenors in proceedings before the freedom of information commission for purposes of allowing an appeal by an aggrieved party. See id., 224–30. We did not hold that a person who did not have a specific legal interest in the subject matter of the decision could have standing to appeal.

Although we conclude that the insurance company defendants lack standing to cross appeal from the trial court's dismissal of the plaintiff's constructive trust and resulting trust claims, we may consider the arguments raised by them in connection with the plaintiff's cross appeal. Cf. *Kerrigan* v.

## III

## THE PLAINTIFF'S CROSS APPEAL

In his cross appeal, the plaintiff claims that the trial court improperly dismissed his constructive trust and resulting trust claims[22] on the ground that they were barred by the doctrine of sovereign immunity. The plaintiff contends that the claims come within the exception to that doctrine for claims of injunctive relief.[23] The state counters that this exception applies only when the plaintiff has alleged that the government has acted in excess of its statutory authority or pursuant to an unconstitutional statute. In turn, the plaintiff disputes the state's claim and also claims that, even if the exception is limited in this way, the state acted in excess of its statutory authority when it accepted the Anthem, Inc., stock. Because we agree with the state that the exception to the doctrine of sovereign immunity is lim-

*Commissioner of Public Health,* 289 Conn. 135, 336 n.15, 957 A.2d 407 (2008) (*Zarella, J.,* dissenting) ("amicus is not at liberty to inject new issues in a proceeding . . . [but] is not confined solely to arguing the parties' theories in support of a particular issue" [internal quotation marks omitted]).

[22] "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. . . . The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment. . . . Thus, a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority,* 291 Conn. 433, 466, 970 A.2d 592 (2009).

"A resulting trust arises by operation of law at the time of a conveyance when the purchase money for property is paid by one party and the legal title is taken in the name of another." (Internal quotation marks omitted.) *Denby* v. *Commissioner of Income Maintenance,* 6 Conn. App. 47, 53, 502 A.2d 954 (1986).

[23] The trial court concluded that the plaintiff's claims of a constructive trust and a resulting trust "are not 'dressed up' claims for money damages, but proper claims for equitable relief." The state does not directly challenge that conclusion on appeal.

ited to actions by the state in excess of its statutory authority or pursuant to an unconstitutional statute and disagree with the plaintiff that the state acted in excess of its statutory authority when it accepted the stock, we conclude that the trial court properly dismissed these claims.

We begin with the standard of review. "Sovereign immunity relates to a court's subject matter jurisdiction over a case, and therefore presents a question of law over which we exercise de novo review. . . . In so doing, we must decide whether [the trial court's] conclusions are legally and logically correct and find support in the facts that appear in the record. . . . The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under our case law. . . . It has deep roots in this state and our legal system in general, finding its origin in ancient common law." (Internal quotation marks omitted.) *DaimlerChrysler Corp.* v. *Law*, 284 Conn. 701, 711, 937 A.2d 675 (2007). "Exceptions to this doctrine are few and narrowly construed under our jurisprudence." (Internal quotation marks omitted.) Id.

In support of his claim on cross appeal, the plaintiff cites this court's statement in *Bloom* v. *Gershon*, 271 Conn. 96, 107, 856 A.2d 335 (2004), that "the state cannot use sovereign immunity as a defense in an action for declaratory or injunctive relief." (Internal quotation marks omitted.) See also *Pamela B.* v. *Ment*, 244 Conn. 296, 328, 709 A.2d 1089 (1998) ("[t]he state is subject to suit without consent . . . in a suit for injunctive relief when the action does not defeat the purpose of the doctrine of sovereign immunity by undue interference with governmental functions" [internal quotation marks omitted]); *Krozser* v. *New Haven*, 212 Conn. 415, 421, 562 A.2d 1080 (1989) ("Sovereign immunity does not bar suits against state officials acting in excess of their statutory authority or pursuant to an unconstitutional

statute. . . . In addition, the state cannot use sovereign immunity as a defense in an action for declaratory or injunctive relief." [Citations omitted; internal quotation marks omitted.]), cert. denied, 493 U.S. 1036, 110 S. Ct. 757, 107 L. Ed. 2d 774 (1990). The state counters that the trial court properly concluded that, under *Doe* v. *Heintz*, 204 Conn. 17, 31, 526 A.2d 1318 (1987), actions for declaratory and injunctive relief may be brought without the consent of the state only when the plaintiff alleges that the state officials had acted in excess of their statutory authority or pursuant to an unconstitutional statute. See id. ("[s]overeign immunity does not bar suits against state officials acting in excess of their statutory authority or pursuant to an unconstitutional statute"); see also *Miller* v. *Egan*, 265 Conn. 301, 314, 828 A.2d 549 (2003) ("a plaintiff seeking to circumvent the doctrine of sovereign immunity must show that . . . in an action for declaratory or injunctive relief, the state officer or officers against whom such relief is sought acted in excess of statutory authority, or pursuant to an unconstitutional statute" [internal quotation marks omitted]). We agree with the state.

This court previously has stated that "[t]he practical and logical basis of the doctrine [of sovereign immunity] is today recognized to rest . . . on the hazard that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds, and property. . . . [A]dherence to the doctrine of sovereign immunity does not mean [however] that all suits against government officers, since they are in effect suits against the government, must be barred. . . . In those cases in which it is alleged that the defendant officer is proceeding under an unconstitutional statute or in excess of his statutory authority, the interest in the protection of the plaintiff's right to be free from the

consequences of such action outweighs the interest served by the sovereign immunity doctrine. Moreover, the government cannot justifiably claim interference with its functions when the acts complained of are unconstitutional or unauthorized by statute. On the other hand, where no substantial claim is made that the defendant officer is acting pursuant to an unconstitutional enactment or in excess of his statutory authority, the purpose of the sovereign immunity doctrine requires dismissal of the suit for want of jurisdiction." (Citations omitted; internal quotation marks omitted.) *Horton* v. *Meskill*, 172 Conn. 615, 624, 376 A.2d 359 (1977).

This court also has stated that, as a general matter, "a court may tailor declaratory and injunctive relief so as to minimize . . . interference [with the state's performance of its functions], and . . . to afford an opportunity for voluntary compliance with the judgment . . . ." (Internal quotation marks omitted.) *Miller* v. *Egan*, supra, 265 Conn. 314. The plaintiff has not cited, however, and our research has not revealed, any case in which this court has concluded that a claim for injunctive relief that did not involve conduct by the state in excess of its statutory authority or pursuant to an unconstitutional statute was not barred by sovereign immunity. Indeed, the cases are to the contrary. See, e.g., *C. R. Klewin Northeast, LLC* v. *Fleming*, 284 Conn. 250, 259–67, 932 A.2d 1053 (2007) (mandamus action in which plaintiff sought order requiring state to pay plaintiff pursuant to settlement agreement did not come within "in excess of statutory authority" exception to sovereign immunity in absence of statute requiring state to implement settlement agreements); *Alter & Associates, LLC* v. *Lantz*, 90 Conn. App. 15, 22–23, 876 A.2d 1204 (2005) (alleged failure of state to honor regulation concerning obligations to contract bidders, without more, did not meet "in excess of statutory authority"

exception to sovereign immunity doctrine for equitable claims). Accordingly, in light of the language in *Horton* v. *Meskill*, supra, 172 Conn. 624, indicating that the exception to the doctrine of sovereign immunity for claims of declaratory or injunctive relief is premised on the notion that a plaintiff has an important interest in being protected from government action in excess of its statutory authority or pursuant to an unconstitutional statute, while the government has no legitimate interest in being free from interference with such conduct, and pursuant to the principle that exceptions to the doctrine of sovereign immunity must be narrowly construed; see *DaimlerChrysler Corp.* v. *Law*, supra, 284 Conn. 711; we must reject the plaintiff's invitation to adopt the dictum in *Doe* v. *Heintz*, supra, 204 Conn. 31–32, *Pamela B.* v. *Ment*, supra, 244 Conn. 328, and *Krozser* v. *New Haven*, supra, 212 Conn. 421, suggesting that the exception may be applied to all claims of injunctive relief, regardless of whether the state has acted in excess of its statutory authority or pursuant to an unconstitutional statute.

The plaintiff also claims, however, that, even if there is no broad exception to the doctrine of sovereign immunity for all claims for injunctive relief, there is an exception for claims to property held by the state in an account that is separate from the general fund. See *Fernandez* v. *Chardon*, 681 F.2d 42, 59 (1st Cir. 1982) ("where state funds are held in a separate account . . . and an award limited to those funds will not affect the state's budgetary decisions . . . its consent to suit and waiver of sovereign immunity seem unnecessary" [citation omitted]), aff'd sub nom. *Chardon* v. *Soto*, 462 U.S. 650, 103 S. Ct. 2611, 77 L. Ed. 2d 74 (1983); see also *Schiff* v. *Williams*, 519 F.2d 257, 262 (5th Cir. 1975) (when fund was not property of state, but only had been entrusted to state pending outcome of appeal, claim against fund was not barred by eleventh amend-

ment to federal constitution); *Conrad* v. *Perales*, 92 F. Sup. 2d 175, 185 (W.D.N.Y. 2000) (burden on state to prove affirmative defense of sovereign immunity by establishing that it had transferred money into general fund); *Morrow* v. *Sudler*, 502 F. Sup. 1200, 1204 (D. Colo. 1980) (eleventh amendment did not bar claim to money obtained from private donors and held by state in separate fund for sole use of state historical society). The plaintiff contends that, because the proceeds from the sale of the stock are "segregated from the state's general treasury, judgment for the plaintiff on the constructive and resulting trust counts . . . will not, in any way, result in the 'disruption of government' that the doctrine of sovereign immunity is designed to prevent."

We agree with the general principle that "where the state will be *unaffected* by [a judgment in favor of the plaintiff], its consent to suit and waiver of sovereign immunity seem unnecessary." (Emphasis added.) *Fernandez* v. *Chardon*, supra, 681 F.2d 59. That principle, however, does not apply in the present case. The trial court entered the interim order to sequester the proceeds from the sale of the stock pending resolution of the plaintiff's motion for order compelling the state and the insurance company defendants to deposit the proceeds from the sale of the stock into the court. In turn, the resolution of that motion with respect to the state was contingent on the resolution of the state's motion to dismiss. If the court were to grant the state's motion to dismiss all of the plaintiff's claims against it, it would be required to deny the motion for order compelling the state and the insurance company defendants to deposit the proceeds into the court with respect to the state because it would have no jurisdiction to order the state to do anything. See *Graham* v. *Zimmerman*, 181 Conn. 367, 373, 435 A.2d 996 (1980) (court lacks jurisdiction over nonparty). For the same reason, the court also would be required to vacate the interim

order. Thus, the interim order was analogous to a temporary restraining order, the sole purpose of which was to preserve the status quo until the court could determine whether the plaintiff's claims against the state would survive the motion to dismiss and, therefore, could provide the basis for an interlocutory judgment of interpleader.[24] If the substantive claims underlying the plaintiff's interpleader action were dismissed, the interpleader action would not lie and the state would be entitled to use the proceeds in the fund immediately.[25] On the other hand, if the interpleader action were to survive the motion to dismiss, the trial court presumably would grant the motion to compel the state to deposit the proceeds subject to the interim order into court pending resolution of the merits of the plaintiff's substantive claims.

Ultimately, however, the trial court vacated the interim order when the parties entered into the stipulation providing that the state could use the funds and that doing so would not affect any party's rights. The plaintiff now contends that the trial court's order and the subsequent stipulation preserving the parties' rights manifested an agreement by the state that the proceeds of the sale of the Anthem, Inc., stock would be available for distribution to the plaintiff if he prevailed before the trial court. Similarly, the insurance company defendants claim that the state "covenanted to make [the proceeds from the sale of the stock subject to the interim order]

---

[24] "An interpleader proceeding typically involves two distinct parts, the first of which is an interlocutory judgment of interpleader. . . . An interlocutory judgment of interpleader, which determines whether interpleader lies, traditionally precedes adjudication of the claims." (Citation omitted.) *State* v. *Burnaka*, 61 Conn. App. 45, 50 n.11, 762 A.2d 485 (2000).

[25] Indeed, after the court issued the interim order, the parties stipulated that the state could use the proceeds and that doing so would not affect any party's rights or claims to them. The state then transferred the proceeds to the general fund. It is clear, therefore, that there were no restrictions on the state's use of the funds other than the interim order, the continued existence of which was dependent on the survival of the plaintiff's claims against the state.

available to the plaintiff should the court . . . find in the plaintiff's favor" in his action against them. Thus, the plaintiff and the insurance company defendants appear to contend that the stipulation was the functional equivalent of an interlocutory judgment of interpleader and that, by entering into it, the state effectively waived its sovereign immunity to the substantive claims underlying the interpleader action and agreed to pay the plaintiff should he prevail on those claims. The stipulation merely provided, however, that the state's use of the proceeds would not affect any existing or future rights of the parties, including the right, created by the interim order, to have the proceeds available to satisfy a future judgment in favor of the plaintiff *should the substantive claims against the state survive the motion to dismiss*.[26] Nothing in the stipulation suggests that it was intended to create new rights.

To the extent that the plaintiff claims that the state's initial creation of the fiduciary agency fund somehow conferred on him and the other state employees a conditional property interest in the fund that will exist until his claim that he is entitled to the proceeds of the stock is judicially resolved, we disagree. The plaintiff has made no claim that the state was legally obligated to create the fund instead of placing the proceeds immediately in the general treasury,[27] and we cannot perceive

---

[26] Indeed, during argument on the motion to dismiss, the trial court stated that it would take the view that it had been "flimflammed" if the proceeds from the sale of the stock were "not immediately available to be used for the purpose of an interpleader action *in the event that the court determines that the action lies*." (Emphasis added.) When the attorney for the state contended that "you can't ratchet [the stipulation] into . . . creating a viable interpleader claim," the trial court responded that it was "certainly not" doing so. Thus, the trial court clearly recognized that the stipulation was not the functional equivalent of an interlocutory judgment of interpleader.

[27] Indeed, the record suggests that the state had no such obligation. The attorney general provided an opinion to the state treasurer regarding this issue in which he stated that "[a]s *a prudential matter*, the proceeds from the liquidation of the stock *may* be maintained in this fund until the legal issues are resolved." (Emphasis added.)

how the state's voluntary and unilateral creation of the fund could confer any rights on any individual or group. Thus, even if, as a matter of internal accounting, the state chooses to maintain a separate account for the proceeds from the sale of the stock until the merits of all claims against the proceeds are resolved, neither the plaintiff nor the insurance company defendants will have any property interest in that account in the absence of any pending claims against the state.

In the cases relied on by the plaintiff in support of his claim that sovereign immunity does not bar his resulting trust and constructive trust claims because a judgment that he is entitled to the proceeds from the sale of the stock cannot affect the state, the government would have been barred from using the money in the separate fund for general government purposes regardless of the outcome of the case.[28] Because that is not the case here, and it is clear that a judgment against

[28] In *Conrad* v. *Perales*, supra, 92 F. Sup. 2d 178, the state had received refunds of medicaid payments from a number of skilled nursing facilities. The refunds included amounts that the plaintiffs, who were patients, had paid to the facilities. Id. The plaintiffs brought an action against the state claiming that the state had converted that portion of the refunds representing their payments. Id., 177. The court concluded that, when an action for the return of money is brought against the state, the burden is on the state to establish sovereign immunity by proving that it has not placed the money in a segregated account. Id., 185. Because the state had not established that it had placed the refunds in the general treasury, the court concluded that it was not entitled to immunity from suit under the eleventh amendment to the federal constitution. Id.

Although this case arguably supports the plaintiff's position that sovereign immunity does not bar a claim to money that has not been placed in the general fund, we are not persuaded by its reasoning. Even if the court in *Conrad* correctly determined that the burden was on the state to establish sovereign immunity and that it could do so by proving that it had not placed the money in a separate account, it would not follow that the state may be sued *whenever* the state has placed money in a separate account. As we explain in the body of this opinion, the purpose and ownership of the separate account are highly relevant to the question of whether an action seeking funds from the account will affect state operations and, therefore, be barred by sovereign immunity.

the state would affect the state's treasury, we reject the plaintiff's claim.

Finally, we address the plaintiff's alternate argument that his claims of a resulting trust and a constructive trust fall into the exception to the doctrine of sovereign immunity for claims for injunctive relief because the state acted in excess of its statutory authority when it accepted the Anthem, Inc., stock. Specifically, the plaintiff contends that the state violated General Statutes § 5-259[29] because the plain language of that statute suggests that each individual employee, and not the state, is a covered individual under the plan. He argues that this interpretation is bolstered by the language of General Statutes § 5-257 (c), which authorizes the state comptroller to procure life insurance for state employ-

---

[29] General Statutes § 5-259 (a) provides in relevant part: "The Comptroller, with the approval of the Attorney General and of the Insurance Commissioner, shall arrange and procure a group hospitalization and medical and surgical insurance plan or plans for (1) state employees . . . . The minimum benefits to be provided by such plan or plans shall be substantially equal in value to the benefits that each such employee . . . could secure in such plan or plans on an individual basis on the preceding first day of July. The state shall pay for each such employee . . . covered by such plan or plans the portion of the premium charged for such . . . employee's individual coverage and seventy per cent of the additional cost of the form of coverage and such amount shall be credited to the total premiums owed by such employee . . . for the form of such member's or employee's coverage under such plan or plans. On and after January 1, 1989, the state shall pay for anyone receiving benefits from any such state-sponsored retirement system one hundred per cent of the portion of the premium charged for such . . . employee's individual coverage and one hundred per cent of any additional cost for the form of coverage. The balance of any premiums payable by an individual employee . . . for the form of coverage shall be deducted from the payroll by the State Comptroller. The total premiums payable shall be remitted by the Comptroller to the insurance company or companies or nonprofit organization or organizations providing the coverage. The amount of the state's contribution per employee for a health maintenance organization option shall be equal, in terms of dollars and cents, to the largest amount of the contribution per employee paid for any other option that is available to all eligible state employees included in the health benefits plan, but shall not be required to exceed the amount of the health maintenance organization premium."

ees and expressly provides that "[a]ny dividends or other refunds or rate credits shall inure to the benefit of the state and shall be applied to the cost of such insurance." The fact that § 5-259 contains no such express language, the plaintiff argues, evinces a contrary legislative intent. See *State* v. *Nixon*, 231 Conn. 545, 563, 651 A.2d 1264 (1995) (when legislature uses language in one statute, absence of language in similar statute shows that legislature intended different result).

It is unclear to us whether the plaintiff is claiming that § 5-259 bolsters his claim that he and others similarly situated were entitled to receive the Anthem, Inc., stock under the plan of conversion, or whether he is claiming that, regardless of whether he and the other similarly situated state employees were entitled to receive the stock under the plan of conversion, § 5-259 required the state to deliver the stock to them. To the extent that the plaintiff is making the former claim, he has not provided any authority for the proposition that the "in excess of statutory authority" exception to the doctrine of sovereign immunity applies in situations where a particular statute may shed light on an issue that is not directly governed by the statute, but resolution of the issue in a way that is inconsistent with the statute would not undermine the purpose of the statute in any way. To the extent that he is claiming that the state actually violated § 5-259 when it failed to deliver the proceeds to him, the plaintiff raised no such claim in his complaint. Practice Book § 10-3 (a) provides that, "[w]hen any claim made in a complaint, cross complaint, special defense, or other pleading is grounded on a statute, the statute shall be specifically identified by its number." The plaintiff has not explained why his statutory claim should not be barred under this rule of practice. Cf. *Mazurek* v. *Great American Ins. Co.*, 284 Conn. 16, 28, 930 A.2d 682 (2007) ("[a]s long as the defendant is sufficiently apprised of the nature of the action . . .

the failure to comply with the directive of Practice Book § 10-3 [a] will not bar recovery" [internal quotation marks omitted]); see also *Moore* v. *Sergi*, 38 Conn. App. 829, 841–42, 664 A.2d 795 (1995) ("[a] plaintiff may not allege one cause of action and recover on another" [internal quotation marks omitted]). We conclude, therefore, that this claim is barred.

Moreover, even if the plaintiff's claim that the state violated § 5-259 was not barred by Practice Book § 10-3 (a), we agree with the trial court's alternate determination that it is meritless. The plaintiff concedes that nothing in § 5-259 sets forth the manner in which proceeds from the demutualization of an insurance company should be distributed. As the trial court recognized, the fact that, unlike § 5-257, § 5-259 does not provide that demutualization proceeds "shall inure to the benefit of the state and shall be applied to the cost of [health] insurance" does not imply that the legislature had a specific intent that the proceeds would be distributed to individual employees. Rather, it implies only that the legislature intended that the entitlement to such proceeds would be governed by the provisions of the insurance contracts and relevant law and that the legislature did not have any specific intent as to how any proceeds to which the state was contractually entitled should be used.

The plaintiff also claims that, even if the state did not violate any statute, in the absence of a statute specifically authorizing it to receive and retain the Anthem, Inc., stock, the state exceeded its statutory authority when it did so. As the plaintiff recognizes, however, the state is specifically authorized to enter into contracts to procure health insurance for state employees. See General Statutes § 5-259. Thus, the state is implicitly authorized to receive any benefits to which it is entitled under those contracts, including any demutualization proceeds.

To the extent that the plaintiff claims that the state acted in excess of its statutory authority when it received and retained the demutualization proceeds because it is *not* entitled to them under the plan of conversion, we conclude that this claim does not fall within the "in excess of statutory authority" exception to the doctrine of sovereign immunity. As we have explained, the entitlement to the Anthem, Inc., stock is governed by the plan of conversion, not by statute. In *C. R. Klewin Northeast, LLC* v. *Fleming,* supra, 284 Conn. 257–67, this court concluded that a mandamus action in which the plaintiff sought an order requiring the state to pay the plaintiff pursuant to a settlement agreement that the state had executed did not come within the "in excess of statutory authority" exception to sovereign immunity in the absence of any statute imposing on the state a mandatory duty to implement settlement agreements, even though the state plainly is not statutorily authorized to breach settlement agreements.[30] See also *Alter & Associates, LLC* v. *Lantz,* supra, 90 Conn. App. 22–23 (alleged failure of state to honor regulation concerning obligations to contract bidders, without more, did not meet "in excess of statutory authority" exception to sovereign immunity doctrine for equitable claims); cf. *Unisys Corp.* v. *Dept. of Labor,* 220 Conn. 689, 697–98, 600 A.2d 1019 (1991) (sovereign immunity did not bar plaintiff's claim that

[30] The insurance company defendants contend that *C. R. Klewin Northeast, LLC,* is distinguishable because, in that case, "the very existence of a property interest was in dispute," while, in the present case, "there is no dispute . . . that a property interest exists and that it is owned either by the state or by some as yet undetermined state employees . . . ." For purposes of reviewing the trial court's denial of the state's motion to dismiss in *C. R. Klewin Northeast, LLC,* however, this court assumed the truth of the plaintiff's allegation that he had a contractually based property interest in the settlement proceeds. *C. R. Klewin Northeast, LLC* v. *Fleming,* supra, 284 Conn. 253 ("we take the facts as expressly set forth, and necessarily implied, in the plaintiff's complaint, construing them in the light most favorable to the pleader").

state was barred from entering into contract because state failed to comply with statute requiring competitive bidding). Similarly, we conclude that, in the absence of any statute governing the entitlement to demutualization proceeds, the plaintiff's claim that the state wrongfully has received and retained those proceeds under the plan of conversion does not fall within the exception.

As we have indicated, the trial court concluded, and the plaintiff conceded, that if none of the plaintiff's substantive claims survived the state's motion to dismiss, then his interpleader action should also be dismissed. We have concluded that the trial court should have dismissed the plaintiff's claim of an unconstitutional taking under his group as a whole theory and that the court properly dismissed the plaintiff's constructive trust and resulting trust claims. Because there are no surviving substantive claims against the state, the interpleader action must be dismissed.[31]

The insurance company defendants' cross appeal is dismissed. The judgment of the trial court denying the state's motion to dismiss the plaintiff's claims under the state constitution and his interpleader action is reversed and the case is remanded to the trial court with direction to dismiss those claims and for further proceedings on the plaintiff's claims against the insurance company defendants. The judgment is affirmed in all other respects.

---

[31] The insurance company defendants request that, if the state prevails on its appeal and this court directs the trial court on remand to dismiss all claims against the state, we should direct the trial court to order the state to place the proceeds from the sale of the stock in a fiduciary agency fund pending the resolution of the plaintiff's claims against them. The dismissal of all claims against the state, however, means that the state will no longer be a party to this case. As we have indicated, neither this court nor the trial court has jurisdiction over persons or entities who are not parties to the action before it. See *Graham* v. *Zimmerman*, supra, 181 Conn. 373. Accordingly, we must deny this request.

In this opinion NORCOTT, VERTEFEUILLE, McLACHLAN and ALVORD, Js., concurred.

SCHALLER, J., concurring in part and dissenting in part. I respectfully disagree with the majority that the trial court improperly denied the motion of the defendants, the former governor, John G. Rowland, and the state of Connecticut, collectively referred to as the state,[1] seeking to dismiss the claim of the plaintiff, Ronald Gold, alleging a taking of his property in violation of article first, § 11, of the constitution of Connecticut. I would affirm the judgment of the trial court with respect to its denial of the motion to dismiss counts one, two, ten, eleven, twelve and thirteen of the second amended complaint.[2] I write separately to emphasize why I believe that the plaintiff is unfairly denied an opportunity to pursue his taking claim.

The majority begins its analysis of this issue by stating its agreement with the state's claim as follows: "We first address the state's claim on appeal that the plaintiff neither alleged nor presented evidence that the state had received the Anthem . . . stock in its capacity as agent for the plaintiff and others similarly situated." Thereafter, the majority discusses the state's claim in terms of the plaintiff's failure to "allege any facts capable of establishing a manifestation of his assent that the state would act on his behalf, any facts capable of establishing that the state agreed to receive the stock on his behalf or any facts capable of establishing that the parties understood that the plaintiff ultimately would be in control of the stock."

---

[1] The plaintiff also brought this action against Anthem, Inc., Anthem Health Plans, Inc., doing business as Anthem Blue Cross and Blue Shield of Connecticut, Anthem East, Inc., and Anthem Insurance Companies, Inc., collectively referred to as Anthem.

[2] I would also affirm the trial court's dismissal of counts five, six and seven of the second amended complaint, and therefore concur in part III of the majority opinion.

At this juncture, it is important to identify the standard of review that applies to the trial court when it decides a motion to dismiss. The majority accurately states the standard as follows: "The standard of review for a court's decision on a motion to dismiss is well settled. A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo. . . . When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone. . . . *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 516, 923 A.2d 638 (2007)." (Internal quotation marks omitted.)

After reciting the trial court's conclusion that, by construing the allegations of the plaintiff's complaint and the facts necessarily implied in the light most favorable to the plaintiff, the plaintiff had stated a colorable taking claim, the majority diverges from its own standard of review as it rejects the trial court's decision. The pivotal reason, as stated by the majority, is that "[t]he plaintiff neither alleged in his complaint nor presented any evidence to the trial court that Anthem . . . in fact delivered the stock to the state in its capacity as the agent for the group as a whole. Rather, the plaintiff's complaint *more reasonably is read* as alleging that Anthem . . . *failed* to deliver the stock to the state in its capacity as the agent for the group as a whole . . . ." (Emphasis altered.) The majority's basis for rejecting

the trial court decision and the plaintiff's taking claim falls short for several reasons.

First, the majority tests the plaintiff's pleading by the wrong standard, that is, as if the motion to dismiss, which properly tests the jurisdiction of the court; see Practice Book § 10-30 et seq.; were a motion to strike, which properly tests the sufficiency of the pleadings. See Practice Book § 10-39 et seq. Although our case law supports the concept of allowing a motion to dismiss to be treated as a motion to strike in situations in which the trial court has done so; see, e.g., *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 501–502, 815 A.2d 1188 (2003); it does not support the concept of *requiring* trial courts to do so, when they have not done so. Nor does it support the concept that this court, sua sponte, should raise that approach—for the first time—in the course of an appeal, which is precisely what the majority does in this instance. In fact, the majority's insistence on raising the issue contravenes the well established notion that "when a decision as to whether a court has subject matter jurisdiction is required, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *In re Judicial Inquiry No. 2005-02*, 293 Conn. 247, 254, 977 A.2d 166 (2009).

Second, the plaintiff had no burden whatsoever at the motion to dismiss stage to present evidence and the majority offers no authority for that proposition. The motion was submitted for argument only and nothing in the record suggests that an evidentiary hearing was sought or held. As the majority indicates in reciting the standard of review for a motion to dismiss for lack of jurisdiction, as stated in *Cogswell*, this motion " 'invokes the existing record and must be decided upon that alone.' "

Third, the majority's *reasonable reading* of the complaint unmistakably recognizes the pleading of an

agency theory. The majority, by recognizing that the plaintiff's complaint alleges that Anthem failed to deliver the stock to the state in its capacity as agent, necessarily must recognize the implicit allegation that the state should have received the property in its capacity as agent for the plaintiff and, in not doing so, engaged in a taking of the property. Although the majority relies heavily on what it assumes to be Anthem's intention in making delivery, presumably, that Anthem had determined that the state was entitled to the stock, the majority offers no authority as to why that intention, whatever it was, is germane to the ultimate determination, much less the dispositive factor in that determination. It is clear, at this point, that Anthem's position in seeking to remain a party to this action is based on its recognition that, from the outset, the state's retention of the property was highly controversial and disputed, a fact that the state also consistently has acknowledged despite its present argument on the matter.

The state's principal argument is that the plaintiff could not prevail on his claim that any receipt by the state could be for the plaintiff's benefit because he failed to allege explicitly an agency relationship. The trial court determined that the issue of agency was a question of fact to be determined at trial and that the plaintiff was not bound to allege, and certainly was not bound to prove, explicitly an agency relationship at the motion to dismiss stage. I have already noted that the majority's own *reasonable reading* of the complaint supports an implicit agency theory, which is sufficient under the majority's own standard of review. Under no circumstances is there any authority to justify the majority's theory that the absence of an explicit allegation of agency or offer of evidence at the motion to dismiss stage leads inevitably to a conclusion that the plaintiff *could not prove* this fact at trial. Under the circumstances, the state's receipt of the stock necessar-

ily would be as an agent for the plaintiff because the state was not entitled to the stock in its own right.

If, as the majority acknowledges, the trial court correctly determined that the plaintiff had "made a colorable claim that the group as a whole was entitled to the stock, and that the plaintiff had a reasonable expectation under the plan of conversion that Anthem . . . would deliver a single, joint distribution of the stock to the group and that the state was the logical representative of the group for the purpose of receiving the stock," it was not necessary for the plaintiff to allege that Anthem delivered the stock to the state in its capacity as agent for the plaintiff in order to survive a motion to dismiss. Ultimately, the plaintiff would have an opportunity to prove that receipt by the state under those circumstances constituted receipt on behalf of the plaintiff. The plaintiff surely was not bound to produce evidence at the motion to dismiss stage. The majority cannot cite any authority for its conclusion that the plaintiff's case fails on the ground that it was bound to allege that Anthem *in fact* delivered the stock to the state as agent. I believe that the trial court acted consistently with the prevailing standard of review and that its conclusion is unassailable. For the foregoing reasons, I respectfully disagree with the majority opinion to the extent that it reverses the judgment of the trial court denying the state's motion to dismiss the taking claim.

I also disagree with the majority that Anthem lacks standing to cross appeal from the trial court's dismissal of the plaintiff's claims against the state. The state argues that Anthem lacks standing to cross appeal because the dismissal of the plaintiff's claims against the state did not affect any specific personal or legal interest of Anthem. Although I agree generally with the majority's statement of the law pertaining to standing, I disagree with its application in this case. The majority concedes that, "as a practical matter, permitting the

plaintiff to pursue his claims against the state could reduce [Anthem's] risk of exposure to multiple recoveries." The majority also concedes that Anthem's "interest in avoiding multiple recoveries . . . probably would be sufficient to confer standing . . . to bring a claim against the state, which are the claims at issue in [Anthem's] cross appeal."

Despite these adverse practical consequences, the majority concludes that Anthem lacks standing to cross appeal on the basis of two extraneous factors—namely, that Anthem has "no legally protectible interest in the *plaintiff's* claims against the state" and that "the plaintiff could have brought a claim for the stock solely against [Anthem] and he could withdraw his claims against the state at will." (Emphasis in original.)

I submit that the majority, in reaching its conclusion, does not apply the established standing criteria correctly. As the majority recognizes, standing is established by demonstrating a "specific personal and legal interest in the *subject matter of the decision,* as distinguished from a general interest, such as is the concern of all members of the community as a whole. . . . *Briggs* v. *McWeeny,* 260 Conn. 296, 308–309, 796 A.2d 516 (2002)." (Emphasis added; internal quotation marks omitted.) Accordingly, the test in this case is not whether Anthem can demonstrate a specific and personal legal interest in the plaintiff's claims against the state, as the majority maintains, but whether Anthem can demonstrate a specific and personal legal interest, as distinguished from a general interest, in "the subject matter of the decision . . . ." (Internal quotation marks omitted.) *Briggs* v. *McWeeny,* supra, 308.

There is no question that Anthem's interest in the trial court's decision is distinct from—and far exceeds—the general interest of the community. See id. Anthem has a substantial interest at stake in this action—it already

has paid a sum exceeding $93 million, representing the proceeds of the stock that Anthem chose to distribute to the state rather than to the plaintiff, and could be compelled to pay that sum yet again. The prospect of making a duplicative payment of nearly $100 million certainly constitutes a specific personal and legal interest.

Moreover, Anthem has a specific personal and legal interest in the subject matter of this action, which is the determination of the rightful owner of the proceeds. If the court ultimately determines in the course of the present action that Anthem mistakenly distributed the stock to the state rather than to the plaintiff, the plaintiff's only recourse will be against Anthem, because the state will no longer be a party to this action. As the majority points out, "[t]he dismissal of all claims against the state . . . means that the state will no longer be a party to this case . . . [and] neither this court nor the trial court has jurisdiction over persons or entities who are not parties to the action before it." See footnote 31 of the majority opinion. Consequently, even if the court determines that the state had no right to receive the stock in the first place and, therefore, has no right to retain it, the disputed property will not be available to the court for purposes of resolving this interpleader action. Given this context, Anthem should be permitted to maintain its cross appeal challenging the trial court's dismissal of the plaintiff's claims against the state.

Anthem's specific and personal interest in the subject matter of the present action clearly has been adversely affected by the dismissal of claims against the state. This action is an interpleader action by the plaintiff against both the state and Anthem, in which the plaintiff seeks an equitable determination as to the proper owner of the disputed proceeds. As Anthem argues in its brief, the viability of the interpleader action depends on the viability of competing substantive claims. See *Commer-*

*cial Discount Co.* v. *Plainfield,* 120 Conn. 274, 279, 180 A. 311 (1935). The trial court's dismissal of the claims against the state has adversely affected Anthem's interest in the determination of the rightful owner of the proceeds by allowing the state, as the party in possession of the disputed proceeds, to be removed from this action. Consequently, Anthem should have the opportunity to establish why the plaintiff's claims against the state should be maintained.

Because Anthem ultimately could be ordered to make a duplicative payment to state employees, Anthem has sufficient interest in keeping the disputed proceeds available to the court. If the court determines that the state was not entitled to the proceeds, the proceeds should be readily available to the court for an appropriate order. That appropriate disposition should not depend on whether Anthem can successfully recover from the state in an independent action, especially when there is a possibility that the state will invoke the doctrine of sovereign immunity to preclude such an action.[3]

---

[3] The majority points out that the "practical and logical basis of the doctrine [of sovereign immunity] . . . rest[s] . . . on the hazard that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds, and property," and emphasizes that the exceptions to the doctrine "are few and narrowly construed under our jurisprudence." (Internal quotation marks omitted.) In discussing the exception to the doctrine of sovereign immunity for claims of declaratory and injunctive relief; see *Pamela B.* v. *Ment,* 244 Conn. 296, 328, 709 A.2d 1089 (1998); *Krozser* v. *New Haven,* 212 Conn. 415, 421, 562 A.2d 1080 (1989), cert. denied, 493 U.S. 1036, 110 S. Ct. 757, 107 L. Ed. 2d 774 (1990); *Doe* v. *Heintz,* 204 Conn. 17, 31–32, 526 A.2d 1318 (1987); the majority rejects the suggestion "that the exception may be applied to all claims of injunctive relief, regardless of whether the state has acted in excess of its statutory authority or pursuant to an unconstitutional statute." In addition, the majority rejects the plaintiff's claim that there is an exception for claims to property held by the state in an account that is separate from the general fund on the ground that "it is clear that a judgment against the state would affect the state's treasury . . . ."

If Anthem proceeds against the state, its primary purpose in doing so, regardless of how it labels any such claims, will be to recoup its losses. Given the majority's emphasis on the purpose of the doctrine of sovereign

Rather, the present interpleader action is the proper vehicle within which to resolve all of the claims in this multiparty action.

As a practical matter, the present action may well be Anthem's only opportunity to compel the state to share in liability if the plaintiff is successful. Although the plaintiff's claims against Anthem are distinct from his claims against the state, and Anthem can be found liable regardless of whether the state remains a defendant, the state's continued presence in the present action has a clear effect on the amount of damages to be paid by Anthem, should it be held liable. The possibility that Anthem might be unable to pursue a claim against the state to recoup its losses militates in favor of Anthem's standing in this action. Likewise, the practical consequences of avoiding the risk of multiple recoveries is a serious concern, as the majority acknowledges. This court has recognized that the practical effect of a challenged decision is a relevant consideration in determining the issue of standing. See *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 231, 602 A.2d 1019 (1992).

Finally, an inflexible interpretation of standing requirements, even if they were accurately applied, is not appropriate. This court has recognized that certain cases "do not fit neatly within the aggrievement rubric." *In re Allison G.*, 276 Conn. 146, 159, 883 A.2d 1226 (2005). The rigid application of the rules in the present case contravenes the well established principles underlying the concept of standing, which "is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are

immunity to protect the state's coffers, and the majority's narrow construction of the few exceptions to the doctrine, it is highly likely that the state would raise the defense of sovereign immunity to preclude any attempt by Anthem to seek reimbursement.

not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Rose* v. *Freedom of Information Commission*, supra, 221 Conn. 223. These objectives of standing are satisfied "when a complainant makes a colorable claim of [a] direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Citations omitted; internal quotation marks omitted.) Id., 223–24. Clearly, Anthem has a significant stake in the outcome of this controversy sufficient to confer standing to cross appeal.

For the foregoing reasons, I respectfully dissent.

PALMER, J., dissenting in part. Although the state constitutional takings claim raised by the plaintiff, Ronald Gold,[1] is factually complex, the theory underlying the claim is straightforward: the plaintiff alleges that he and others similarly situated are entitled to the 1,645,773 shares of Anthem, Inc., stock that represent the proceeds of the demutualization of Anthem Insurance Companies, Inc. (Anthem Insurance), and, therefore, the state's receipt, retention and disposition of that stock— worth nearly $100,000,000—constitutes a taking without just compensation in violation of article first, § 11, of the state constitution.[2] In summarily rejecting the extremely thorough and thoughtful decision of the trial court denying the state's motion to dismiss the plain-

---

[1] At all times relevant to the present case, the plaintiff was an employee of the state of Connecticut.

[2] In essence, the plaintiff claimed that he and others similarly situated, and not the state, were the eligible "statutory members" of Anthem Insurance and, therefore, the rightful owners of the Anthem, Inc., stock.

tiff's claim on the ground of sovereign immunity, the majority relies on the facts, first, that the plaintiff has not alleged that Anthem Insurance delivered the Anthem, Inc., stock to the state in its capacity as agent for the plaintiff and, second, the plaintiff cannot prove that Anthem Insurance delivered the stock to the state believing that the state was the plaintiff's agent. Neither fact, however, provides any support for the majority's conclusion: contrary to the majority's conclusion, for purposes of a motion to dismiss, it is irrelevant that the complaint does not allege a principal-agent relationship, and there is ample evidence to support a finding that the state received the stock as agent for the plaintiff notwithstanding Anthem Insurance's subjective understanding to the contrary. Finally, the majority turns our law on its head in concluding that the trial court was required to treat the state's motion to dismiss as a motion to strike even though the trial court was never asked to do so. I therefore dissent.[3]

[3] I therefore would affirm the trial court with respect to its denial of the state's motion to dismiss counts one, two, ten, eleven, twelve and thirteen of the second amended complaint. Counts one and two allege claims in the nature of interpleader under General Statutes § 52-484; counts ten and eleven allege a taking of his property in violation of article first, § 11, of the state constitution; counts twelve and thirteen allege a violation of due process under article first, § 8, of the state constitution arising out of the alleged improper taking of his property. Although I otherwise generally agree with the judgment of the majority, I do not agree that Anthem, Inc., Anthem Health Care Plans, Inc., doing business as Anthem Blue Cross and Blue Shield of Connecticut, Anthem East, Inc., and Anthem Insurance, collectively referred to as the insurance company defendants, lack standing to bring their cross appeal. As the majority acknowledges, "as a practical matter, permitting the plaintiff to pursue his claims against the state could reduce the insurance company defendants' risk of exposure to multiple recoveries" and, further, those companies' "interest in avoiding multiple recoveries against them probably would be sufficient to confer standing on them to bring a claim against the state, which are the claims at issue in the insurance company defendants' cross appeal." Moreover, we do not know whether the insurance company defendants would be able to raise any such claims against the state. In such circumstances, I believe that the insurance company defendants' interest in the state's continued participation in the case— the subject of this appeal—is sufficient to afford them standing for purposes

I

I begin with a brief summary of the relevant portion of the trial court's memorandum of decision. In denying the state's motion to dismiss the plaintiff's state constitutional takings claim, the trial court explained that "the state's sale of the disputed stock and continuing retention of all proceeds from its sale for its own use would clearly constitute a taking, in the constitutional sense," if, at trial, the plaintiff can prove, first, that the plaintiff class of insureds, or " 'group as a whole,' " received collective membership rights in Anthem Insurance pursuant to the insurance policy covering the group, including the right to receive a single joint distribution of stock or cash from Anthem, Inc., upon the demutualization of Anthem Insurance, and second, that the relationship between the state and the group as a whole was, in light of the governing insurance policies and other relevant evidence, that of principal and agent.[4] The majority does not contend that this determination of the trial court necessarily is unsound, either factually or legally.

The trial court also identified evidence in the record from which the trier of fact reasonably could find that the state was the agent for the group as a whole. This evidence includes language in the Anthem Insurance plan of conversion that, as the trial court explained, "expressly acknowledges what the plaintiff has argued

of maintaining their cross appeal. See, e.g., *Nanni* v. *Dino Corp.*, 117 Conn. App. 61, 70, 978 A.2d 531 (2009) ("Aggrievement, in essence, is appellate standing. . . . In the appellate context, [a]ggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." [Internal quotation marks omitted.]).

[4] The trial court rejected the plaintiff's alternative theory of entitlement under article first, § 11, of the state constitution, pursuant to which the plaintiff and others similarly situated would be individually entitled to the stock proceeds. The plaintiff has not appealed from that portion of the trial court's judgment.

all along under his . . . theory of entitlement, to wit: that the [group or association of insureds, defined as] grandfathered groups . . . not their common employers, had membership rights in [Anthem Blue Cross and Blue Shield of Connecticut] prior to its merger into Anthem Insurance. . . . [That plan] clearly states, as the plaintiff has also argued, that Anthem Insurance agreed to continue those very membership rights in itself following the merger, and thus that the grandfathered groups became new members of Anthem Insurance, *not their common employers.*" (Emphasis added.) The trial court also relied on language in one of the insurance policies providing that "[t]he Anthem [Insurance] [m]ember is the fiduciary agent of the [c]overed [p]ersons hereunder," as well as language in another policy stating that, "[f]or the purposes of this [a]greement, *the [e]mployer is the agent of the subscribers and not the agent of the [health maintenance organization].*" (Emphasis added.) The court further observed that, pursuant to article II of the corporate by-laws of Anthem Insurance's Connecticut subsidiary, " '[i]n the case of a group insurance policy, the group as a whole shall be considered one policyholder, and such policyholder's rights as a [v]oting [m]ember shall be exercised by the individual designated in, or pursuant to, such policy to act for the group for voting purposes.' " Finally, the court noted that, consistent with the plaintiff's claims, "two Anthem [Insurance] vice presidents, David Frick and Cynthia Miller, both stated in their testimony at the demutalization hearing before the Indiana commissioner of insurance on October 2, 2001, that under the by-laws and articles of incorporation of Anthem Insurance, it has always been understood that, in the case of group insurance policies, the members of the company for all purposes are not the employers who procure or pay for their policies, but the individual employees who hold certificates of coverage

thereunder, and thus any distribution in the event of a demutualization goes only to them."

This evidence—which the majority ignores—clearly is sufficient to permit a finding that the state received the stock proceeds from the demutualization as agent for the group as a whole and not as the owner of those proceeds. In other words, as the trial court expressly found, "there is at least a genuine issue of material fact as to whether the plaintiff can establish that his and his fellow class members' group as a whole had a collective right under the plan of conversion to receive stock or cash upon the demutualization of Anthem Insurance."[5] (Internal quotation marks omitted.)

Notwithstanding the evidence tending to establish that the state was the agent of the group as a whole, the majority concludes that the trial court improperly denied the state's motion to dismiss for lack of subject matter jurisdiction because "[t]he plaintiff neither alleged in his complaint nor presented any evidence to the trial court that Anthem Insurance in fact delivered the stock to the state in its capacity as the agent for the group as a whole." In support of this assertion, the majority states: "Rather, the plaintiff's complaint more reasonably is read as alleging that Anthem Insurance *failed* to deliver the stock to the state in its capacity as the agent for the group as a whole, in violation of Anthem Insurance's obligations under the plan of conversion." (Emphasis in original.) With respect to this assertion, the majority relies on the allegation of the plaintiff's complaint that "[t]he stock which should have been issued to [the plaintiff] and the members of the

---

[5] I note that, to the extent that the existence of a principal-agent relationship may be deemed to be a jurisdictional fact, the state has made no effort to demonstrate that the plaintiff cannot establish such a relationship as a matter of law. Thus, the existence of a principal-agent relationship remains in dispute, the resolution of which must await a trial on the merits. See, e.g., *Conboy* v. *State*, 292 Conn. 642, 651–56, 974 A.2d 669 (2009).

class . . . was issued by Anthem [Insurance] to [the state] . . . ."

The majority further explains that the plaintiff does not dispute either that Anthem Insurance determined that the state, and not the plaintiff and others similarly situated, was the rightful owner of the Anthem, Inc., stock, or that Anthem Insurance delivered that stock to the state in its capacity as the owner of the stock. Although the majority acknowledges the plaintiff's claim that "these actions violated the plan of conversion"—that is, in the plaintiff's view, Anthem Insurance was *wrong* in its determination that the state was the rightful owner of the stock proceeds—the majority nevertheless asserts that, "in the absence of any allegation that Anthem Insurance in fact delivered the stock to the state in its capacity as the agent for the plaintiff and others similarly situated, we must conclude that the trial court improperly determined that the plaintiff could prove this fact at trial."[6] As I explain hereinafter, the majority's analysis cannot withstand scrutiny, first, because it improperly treats the state's motion to dismiss as a motion to strike, and second, because it relies on a consideration that is entirely irrelevant to the issue of whether the trial court should have dismissed the plaintiff's claim, namely, the plaintiff's failure to allege or prove facts establishing that Anthem Insurance delivered the stock to the state in the belief that the state was receiving the stock as agent for the plaintiff and others similarly situated. The majority's faulty analysis leads to its erroneous conclusion that the trial court

---

[6] In reaching this conclusion, the majority also observes that "the trial court may have been correct that the plaintiff has made a colorable claim that the group as a whole was entitled to the stock, and that the plaintiff had a reasonable expectation under the plan of conversion that Anthem Insurance would deliver a single, joint distribution of the stock to the group and that the state was the logical representative of the group for the purpose of receiving the stock . . . ."

improperly refused to dismiss the plaintiff's constitutional taking claim.

Before commencing a review of the majority opinion, however, it is necessary first to set forth certain legal principles relevant to the issue raised by this appeal. It is well established that the doctrine of sovereign immunity generally bars suits against the state without its consent. See, e.g., *Kelly* v. *University of Connecticut Health Center*, 290 Conn. 245, 252, 963 A.2d 1 (2009). Because sovereign immunity implicates subject matter jurisdiction; id.; that is, "the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong"; (internal quotation marks omitted) *MBNA America Bank, N.A.* v. *Boata*, 283 Conn. 381, 389, 926 A.2d 1035 (2007); that doctrine is a basis for granting a motion to dismiss. See, e.g., *Kelly* v. *University of Connecticut Health Center*, supra, 252. "Although it is a critical prerequisite to any court's involvement in a case, we repeatedly have held that, when a decision as to whether a court has subject matter jurisdiction is required, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *In re Judicial Inquiry No. 2005-02*, 293 Conn. 247, 253, 977 A.2d 166 (2009). Moreover, "in reviewing a motion to dismiss, we take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Kelly* v. *University of Connecticut Health Center*, supra, 252. The doctrine of sovereign immunity, however, "is not available to the state as a defense to claims for just compensation arising under article first, § 11, of the Connecticut constitution. . . . When possession has been taken from the owner, he is constitutionally entitled to any damages which he may have suffered . . . . To survive a motion to dismiss on the ground of sovereign immunity, [how-

ever] a complaint must allege sufficient facts to support a finding of a taking of [property] in a constitutional sense." (Citation omitted; internal quotation marks omitted.) *184 Windsor Avenue, LLC* v. *State,* 274 Conn. 302, 319, 875 A.2d 498 (2005). With these principles in mind, I now turn to the majority opinion.

The majority concludes that the trial court should have granted the state's motion to dismiss for lack of subject matter jurisdiction because, even though the plaintiff's constitutional takings claim ordinarily would surmount the defense of sovereign immunity, "the plaintiff neither alleged nor presented evidence that the state had received the Anthem, Inc., stock in its capacity as agent for the plaintiff and others similarly situated." As discussed hereinafter, these reasons provide no basis whatsoever for dismissing the plaintiff's constitutional claim.

With respect to the first reason proffered by the majority—that is, the complaint contains no allegation asserting that the state is the agent of the plaintiff and others similarly situated with respect to the stock to which the plaintiff claims that he and those other similarly situated state employees are entitled—a motion to dismiss is not the proper vehicle to challenge that alleged pleading defect. As this court explained in *Gurliacci* v. *Mayer,* 218 Conn. 531, 544, 590 A.2d 914 (1991), a motion to dismiss "properly attacks the jurisdiction of the court, essentially asserting that the plaintiff *cannot as a matter of law and fact* state a cause of action that should be heard by the court." (Emphasis added; internal quotation marks omitted.) In the present case, the plaintiff's failure to allege the existence of a principal-agent relationship does not mean that he cannot establish such a relationship as a matter of fact. At most, the complaint is deficient because it fails to state

a legally sufficient cause of action;[7] if so, the proper remedy is granting a motion to strike, for as this court also stated in *Gurliacci*, "if a pleading . . . on its face is legally insufficient, although facts may indeed exist which, if properly pleaded, would establish a cause of action upon which relief could be granted, a motion to strike is required." (Internal quotation marks omitted.) Id.

The Appellate Court recently elaborated upon the distinction between a motion to dismiss and a motion to strike in *Egri* v. *Foisie*, 83 Conn. App. 243, 247–50, 848 A.2d 1266, cert. denied, 271 Conn. 931, 859 A.2d 930 (2004), explaining as follows: "This case causes us to consider the function of two motions that are basic to our civil procedure, the motion to dismiss and the motion to strike. The motion to dismiss is governed by Practice Book §§ 10-30 through 10-34. Properly granted on jurisdictional grounds, it essentially asserts that, as a matter of law and fact, a plaintiff cannot state a cause of action that is properly before the court. . . . By contrast, the motion to strike attacks the sufficiency of the pleadings. Practice Book § 10-39; see also 1 E. Stephenson, Connecticut Civil Procedure (3d Ed. 1997) § 72 (a), pp. 216–17. . . .

"There is a significant difference between asserting that a plaintiff *cannot* state a cause of action and asserting that a plaintiff *has not* stated a cause of action, and therein lies the distinction between the motion to dismiss and the motion to strike. . . .

"A motion to dismiss does not test the sufficiency of a cause of action and should not be granted on other

---

[7] I need not address the question of whether the complaint is, in fact, legally deficient because it fails to allege the existence of a principal-agent relationship. That is, I need not decide whether the plaintiff was required to allege the existence of such a relationship in order to have set forth a cognizable takings claim. Because a motion to dismiss is not the proper vehicle for challenging the legal sufficiency of a pleading, that question is not before this court.

than jurisdictional grounds. . . . [When a motion to dismiss is] used to perform . . . the function of a [motion to strike] . . . the court should [deny] the motion. . . .

"The distinction between the motion to dismiss and the motion to strike is not merely semantic. If a motion to dismiss is granted, the case is terminated, save for an appeal from that ruling. . . . The granting of a motion to strike, however, ordinarily is not a final judgment because our rules of practice afford a party a right to amend deficient pleadings. See Practice Book § 10-44.

"That critical distinction implicates a fundamental policy consideration in this state. Connecticut law repeatedly has expressed a policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his or her day in court. . . . Our practice does not favor the termination of proceedings without a determination of the merits of the controversy where that can be brought about with due regard to necessary rules of procedure. . . . For that reason, [a] trial court should make every effort to adjudicate the substantive controversy before it, and, where practicable, should decide a procedural issue so as not to preclude hearing the merits of an appeal." (Citations omitted; emphasis in original; internal quotation marks omitted.)

As a consequence of its failure to recognize the distinction between a motion to dismiss and a motion to strike, the majority wrongly concludes that the state was entitled to dismissal of the plaintiff's constitutional takings claim. The fact that the majority's decision was predicated on the sufficiency of the pleadings is reflected in the concluding sentence of the majority's analysis: "[I]n the absence of any *allegation* that Anthem Insurance in fact delivered the stock to the

state in its capacity as the agent for the plaintiff and others similarly situated, we must conclude that the trial court improperly determined that the plaintiff could prove this fact at trial." (Emphasis added.) As this assertion by the majority demonstrates, in the majority's view, the plaintiff's failure to *plead* the existence of a principal-agent relationship is fatal to his constitutional takings claim and requires dismissal of that claim. The majority simply is incorrect: the plaintiff's claim may be subject to a motion to strike, but clearly is not subject to a motion to dismiss.

In addition to its misplaced reliance on the fact that the plaintiff *failed* to allege a principal-agent relationship in his complaint, the majority also relies on certain allegations that the plaintiff *does* make in his complaint to support its conclusion that the plaintiff's takings claim must be dismissed. In particular, the majority points to the allegation in the complaint that "[t]he stock which should have been issued to [the plaintiff] and the members of the class pursuant to the [p]lan of [c]onversion . . . was issued by Anthem [Insurance] to [the state] . . . ." The majority asserts that this statement does not allege a principal-agent relationship but, rather, "more reasonably is read as alleging that Anthem Insurance *failed* to deliver the stock to the state in its capacity as the agent for the group as a whole, in violation of Anthem Insurance's obligations under the plan of conversion." (Emphasis in original.) This assertion by the majority again exemplifies its erroneous preoccupation with the manner in which the plaintiff has *pleaded* his claim—a matter properly addressed in the context of a motion to strike rather than via a motion to dismiss—and not whether the claim is sufficient to survive a motion to dismiss for lack of subject matter jurisdiction. As previously explained, a complaint will survive a motion to dismiss if the plaintiff can demonstrate facts which, if credited, would be sufficient to

support a particular cause of action. If not, the motion must be granted; otherwise, the motion must be denied despite the fact that the allegations of the complaint are legally inadequate.[8] In the present case, the trial court properly relied on evidence in the record to support its conclusion that there exists a genuine issue of material fact with respect to whether the state is, in fact, the agent of the group as a whole, thereby saving the plaintiff's claim from the state's jurisdictional challenge. See, e.g., *Conboy* v. *State*, 292 Conn. 642, 649–55, 974 A.2d 669 (2009) (trial court properly considered allegations of complaint *and* facts contained in record in denying motion to dismiss for lack of subject matter jurisdiction).

The majority does not dispute that it does, in fact, treat the state's motion to dismiss as a motion to strike. Rather, the majority seeks to justify its treatment of the state's motion in that manner on the ground that "[t]his court previously has held . . . that, when a complaint properly would have been subject to a motion to strike, and the plaintiff has made no showing that he could amend the complaint to avoid the deficiencies of the original complaint, the granting of a motion to dismiss instead of a motion to strike is harmless error." The majority further states: "Similarly, when a complaint properly would have been subject to a motion to strike and the plaintiff cannot cure the deficiencies

---

[8] I note, moreover, that there is nothing in the plaintiff's complaint that is inconsistent with the requirement of a principal-agent relationship. Indeed, as I previously have noted, it is axiomatic that the allegations of a complaint must be considered in the light most favorable to the pleader; see, e.g., *Conboy* v. *State*, 292 Conn. 642, 651, 974 A.2d 669 (2009); and every presumption is to be indulged in favor of jurisdiction. See, e.g., *State* v. *Velky*, 263 Conn. 602, 605–606, 821 A.2d 752 (2003). Moreover, even if the allegations in the complaint were inconsistent with such a relationship, that fact alone would not deprive the court of subject matter jurisdiction over the plaintiff's takings claim because, for purposes of a motion to dismiss, the seminal question is whether the plaintiff can prove a principal-agent relationship, not whether he has alleged it.

in the complaint, we properly may reverse the trial court's denial of a motion to dismiss rather than remand the case to the trial court so that the defendant may file a motion to strike that the trial court would be required to grant." Applying these principles to the present case, the majority asserts that, because "the complaint . . . properly would have been subject to a motion to strike[9] and . . . because the plaintiff has not pointed to any evidence that Anthem Insurance transferred the stock to the state in its capacity as the agent for the plaintiff and others similarly situated, we must conclude that he cannot amend the complaint to cure its deficiencies. Accordingly, we properly may reverse the ruling denying the motion to dismiss."

I respectfully submit that the majority's reasoning is wholly unpersuasive. First, even if the trial court in the present case properly would have granted a motion to strike, in those cases in which we have treated a motion to dismiss as a motion to strike, this court has *granted* the motion to dismiss and we have concluded that, although it was *error* for the court to have granted the motion, the error was harmless. See, e.g., *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 501, 815 A.2d 1188 (2003). In the present case, the trial court *denied* the state's motion to strike, a ruling that reasonably cannot be characterized as improper or incorrect as a matter of law because the trial court was under no obligation to grant what the majority itself concedes was the *wrong* motion. Nevertheless, the majority, with the benefit of hindsight not available to the trial court, concludes that that court abused its discretion in failing

---

[9] The majority incorrectly asserts that I do not dispute that the trial court would have granted the motion to strike for failure to allege a principal-agent relationship. In fact, I do not know whether the trial court would have granted such a motion in the present case. See footnote 7 of this opinion. For the reasons set forth hereinafter, however, even if a motion to strike would have been granted, it is improper for the majority to reverse the judgment of the trial court on that ground.

to treat the motion to dismiss as a motion to strike. I disagree with this conclusion because it is one thing to *affirm* as harmless error a trial court's judgment *granting* the wrong motion, but it is something else entirely to *reverse* a trial court's judgment *denying* the wrong motion.

The majority's impropriety is compounded by the fact that the state has never even asked *this court* to treat its motion to dismiss as a motion to strike. Rather, the majority takes this approach on its own, without notice to the parties. Of course, we may *affirm* a trial court's judgment on such an alternate ground, but even then, we generally will not do so unless that ground has been raised by the prevailing party. In the present case, however, the majority elects not only to *reverse* the judgment of the trial court on an alternate ground, it does so on the basis of a claim that never has been raised by the state or briefed by the parties. In my view, this is unacceptable, first, because it results in an ambuscade of the trial judge, who never had an opportunity to consider the alternate claim that the majority now decides in the state's favor, and second, because it is unfair to the plaintiff, who has never had the opportunity to address that alternate claim for reversal in this court.

More importantly, however, even if the plaintiff's constitutional claim would be subject to a motion to strike for failing to allege a principal-agent relationship, the majority simply is incorrect in concluding that the plaintiff would not be able to amend his complaint to allege that the state is holding the stock proceeds as agent for the plaintiff and those similarly situated.[10] In support of its contention, the majority asserts that, because the

[10] For this same reason, the majority's conclusion reversing the judgment of the trial court would be incorrect even if a motion to dismiss were the proper procedural vehicle for challenging the plaintiff's takings claim.

plaintiff "does not dispute [either] that Anthem Insurance determined that the state was entitled to the stock as a statutory member in its own right and that the plaintiff and others similarly situated were *not* statutory members and were *not* entitled to the stock . . . [or] that Anthem Insurance delivered the stock to the state in its capacity as a statutory member in its own right"; (emphasis in original); the plaintiff therefore cannot establish, as a matter of fact, that the state received the stock in its capacity as agent for the plaintiff and others similarly situated. Thus, although the majority acknowledges "the evidence supporting an inference that the state was the agent for the plaintiff and others similarly situated," the majority nevertheless contends that the plaintiff cannot amend his complaint to state a legally cognizable cause of action because he "has pointed to no evidence . . . that [Anthem Insurance] transferred the stock to the state in its capacity as an agent [for the plaintiff and others similarly situated] and not in its capacity as [the owner of the stock]." Put differently, under the majority's reasoning, unless the plaintiff can demonstrate that Anthem Insurance delivered the stock to the state *believing* that the state was the plaintiff's agent, he cannot prevail on his claim.

Simply put, the rationale underlying the majority's conclusion that the plaintiff cannot state a cognizable claim lacks any support in the law. The fact that Anthem Insurance delivered the stock to the state in the *belief* that the state was entitled to the stock proceeds of the demutualization has little or no relevance with respect to the plaintiff's contention that the state did, in fact, receive the stock as the agent of the plaintiff and those similarly situated, and it certainly is not determinative of that issue. The success of the plaintiff's takings claim hinges on whether he can prove, on the basis of the totality of the evidence, that the state accepted and retained the stock that was delivered to it by Anthem

Insurance in its capacity as agent for the plaintiff and others similarly situated, not on Anthem Insurance's subjective intent when it delivered the stock to the state. In other words, as the trial court explained, Anthem Insurance's subjective understanding concerning the nature of the state's relationship to the plaintiff with respect to the stock when Anthem Insurance delivered that stock to the state is not a bar to the plaintiff's claim of a constitutional taking; the issue, rather, is the nature of that relationship as reflected, inter alia, in the various relevant insurance policies and other pertinent documents in existence *prior* to the demutualization and *prior* to Anthem Insurance's subsequent transfer of the stock to the state.[11] Put differently, the plaintiff has every right to attempt to prove that the state received the Anthem, Inc., stock as agent for the plaintiff and that Anthem Insurance's contrary belief simply was mistaken. Indeed, there is absolutely no basis in law or in fact for the majority's assertion that the plaintiff cannot state a cognizable takings claim merely because of Anthem Insurance's subjective understanding that it was delivering the stock to the state in the state's capac-

---

[11] The trial court explained this point as follows: "Under [the plaintiff's] analysis, by the time the plan of conversion became effective, the plaintiff's group's membership rights in Anthem Insurance, including their right to receive stock or cash or other consideration in exchange for the extinguishment of such rights in the event of a demutualization, were already fully established, notwithstanding any claim or suggestion to the contrary that might later be made by Anthem Insurance, either . . . in drafting or implementing the plan of conversion [or otherwise]. Accordingly, although Anthem Insurance admittedly assumed that the state was entitled to become the statutory member of [Anthem, Inc.] pursuant to [a group health insurance policy known as] the care plus policy, based perhaps on the mistaken threshold assumption that the state, not the 'group as a whole,' was the one true policyholder and voting member of [Anthem Health Care Plans, Inc., a subsidiary of Anthem Insurance] in relation to that policy before the merger, it had no power to alter, by acting on that allegedly mistaken assumption or otherwise, the established rights of the plaintiff's group vis-à-vis the state with respect to the ultimate ownership and right to benefit from the sale of membership rights in [Anthem, Inc.]."

ity as owner. It therefore is not surprising that the majority has provided no authority to support its bald assertion that the plaintiff's claim founders on Anthem Insurance's belief as to the ownership of the stock at the time it delivered the stock to the state.

Indeed, even the state itself has never maintained that the plaintiff cannot prevail on his claim that the state now holds the stock proceeds as agent for the plaintiff and those similarly situated merely because Anthem Insurance purported to deliver the stock to the state in its capacity as owner rather than as agent for the plaintiff and others similarly situated. In fact, the majority injects that issue into the case entirely on its own, without any explanation as to *why* Anthem Insurance's subjective understanding that it was delivering the stock to the state as owner is relevant—let alone critical—to the determination of who *actually* owns the stock. As I have explained, merely because the plaintiff does not dispute Anthem Insurance's assertion that it delivered the stock to the state in the belief that the state was the rightful owner of the stock is not determinative of whether the state is, indeed, the owner of the stock or, instead, was required, as agent of the plaintiff, to deliver the stock to the plaintiff as its principal.[12]

It is apparent, therefore, that the court has subject matter jurisdiction over the plaintiff's takings claim despite the absence of an express allegation in the com-

---

[12] Of course, to the extent that Anthem Insurance's understanding that it was delivering the stock to the state as the owner of the stock may be well founded in light of any documentary and other evidence that supports that view, that evidence will be highly relevant at trial. The determination of whether the state or the plaintiff is the rightful owner of the stock, however, does not depend on the state of mind of Anthem Insurance at the time it delivered the stock to the state. As previously discussed, that determination depends upon the intent of the parties, as reflected in the documentary and other relevant evidence, prior to the demutualization and the state's receipt of the stock from Anthem Insurance.

plaint that the state is the agent of the plaintiff and others similarly situated with respect to the stock proceeds of the Anthem Insurance demutualization. Consequently, the trial court properly denied the state's motion to dismiss insofar as that motion was predicated on the contention that the plaintiff's failure to plead a principal-agent relationship deprived the court of subject matter jurisdiction over the plaintiff's claim.

## II

The state also raises several additional claims in support of its contention that the trial court improperly denied its motion to dismiss the plaintiff's constitutional takings claim.[13] The state first contends that the property interest the plaintiff claims to have been deprived of "is not coextensive with his claimed entitlement under the demutualization." The state asserts, rather, that "[i]f [Anthem, Inc.] had been distributing shares of stock to the [s]tate as agent for the plaintiff, a quantifiably different amount of stock would have been allocated and delivered." As a result, the state maintains, the plaintiff cannot establish a discrete property interest in the specific shares of stock received by the state. The trial court rejected this claim, concluding, in essence, that the claim was unsupported by the record. On appeal, the state identifies no evidence or facts to support its claim; rather, the state relies solely on a statement of defense counsel, made in the trial court during oral argument on the motion to dismiss, asserting merely that the amount of stock distributed "could be higher or lower" depending upon whether the state received the stock as owner or as agent for the group as a whole. This statement provides an inadequate basis for disturbing the court's ruling. Furthermore, even if the state is correct that it may have received more or less stock as the putative owner of the stock than it

---

[13] The majority does not reach these claims.

would have received as the agent for the group as a whole, the state has failed to demonstrate why that fact alone would defeat the plaintiff's takings claim. Absent any factual or legal basis for the state's claim, it must fail.

In reliance on *184 Windsor Avenue, LLC* v. *State*, supra, 274 Conn. 302, the state also contends that, before the plaintiff properly can allege facts necessary to maintain a takings claim, he first must "convert his inchoate claim" of entitlement to the demutualization proceeds into a property right. The state claims that until the plaintiff proves that the group as a whole, and not the state, is the statutory member entitled to the stock proceeds, the plaintiff cannot demonstrate an identifiable property interest in those proceeds and, therefore, his claim must be dismissed. Neither *184 Windsor Avenue, LLC*, nor any other precedent of which I am aware supports the state's contention.

In *184 Windsor Avenue, LLC*, the plaintiff, 184 Windsor Avenue, LLC, alleged that the state had failed to pay additional rent due under two lease agreements. Id., 305. The leases contained tax escalation clauses pursuant to which the state had agreed to pay, as additional rent, any increases in real estate property taxes levied on the leased properties over the lease term. Id. When the state failed to pay the taxes, the plaintiff filed a claim with the claims commissioner, alleging, inter alia, an unconstitutional taking of the plaintiff's property. The claims commissioner determined that the plaintiff was not entitled to the additional rent because the tax escalation clauses were invalid as a matter of law. Id., 306–307. The plaintiff thereupon commenced a civil action against the state in which it again alleged an unconstitutional taking. Id., 307. The trial court concluded that the takings claim was barred by sovereign immunity because the tax escalation clauses were unlawful and, therefore, unenforceable. Id. This court

affirmed the judgment of the trial court, stating that, "[i]n the present case, the trial court properly concluded that the tax escalation clause was an invalid lease term because it had not been approved by the [state properties] review board pursuant to [General Statutes] § 4b-23 (e). . . . The facts in the complaint, even when construed broadly in a manner most favorable to the plaintiff, simply fail to support a finding that the tax escalation clause was valid as a matter of law. The complaint mentions nothing about [state properties] review board approval, which is a necessary component of a valid contract at law pursuant to § 4b-23 (e). . . . The plaintiff, therefore, does not have an enforceable property interest in the income that would be generated by the tax escalation clause. Accordingly, the claim was properly dismissed by the trial court." (Citations omitted.) Id., 319–20.

As the foregoing summary of *184 Windsor Avenue, LLC*, reveals, that case is wholly inapposite to the present case. Here, the record discloses facts which, if proven, would establish the plaintiff's property interest in the demutualization proceeds. Consequently, the plaintiff's complaint, by contrast to the complaint in *184 Windsor Avenue, LLC*, alleges an enforceable and identifiable property interest in the proceeds received by the state sufficient to withstand a motion to dismiss.[14]

[14] The state also claims that (1) its passive receipt of property under claim of right cannot constitute an unconstitutional taking, and (2) the plaintiff was obligated to exhaust his remedies with the claims commissioner in accordance with General Statutes § 4-142 et seq. before commencing the present action. With respect to the first claim, the state has provided no persuasive reason why the state cannot be held liable under article first, § 11, of the state constitution for retaining property that does not belong to it even though its receipt of that property may be characterized as passive, and I can conceive of no such reason. Indeed, as this court has explained, "property may be 'taken' [for purposes of article first, § 11] without any actual appropriation or physical intrusion"; *Tamm* v. *Burns*, 222 Conn. 280, 284, 610 A.2d 590 (1992); and "[a] constitutional taking occurs when there is a substantial interference with private property which destroys or nullifies its value or by which the owner's right to its use or enjoyment is in a

Whether the plaintiff can prove that interest is the crux of the matter, and he is entitled to the opportunity to do so as part of his unconstitutional takings claim.

### III

As the trial court stated in concluding that an immediate appeal was warranted with respect to the issues resolved by its partial grant of the state's motion to dismiss for lack of subject matter jurisdiction; see Practice Book § 61-4; "[t]his is a massive, complex case in which vital financial interests of the state, the plaintiff, a putative class of several thousand state employees, and the [insurance company] defendants are at stake." *Gold* v. *Rowland*, Superior Court, judicial district of Hartford, Docket No. CV-02-0813759-S (January 18, 2007). Under today's ruling, however, the plaintiff will be denied his day in court with respect to those significant financial interests, at least insofar as the state is concerned, due to the majority's erroneous conclusion that the state is entitled to dismissal of the plaintiff's constitutional takings claim. I therefore respectfully dissent from that portion of the majority opinion that reverses the judgment of the trial court denying the state's motion to dismiss the takings claim.

substantial degree abridged or destroyed." (Internal quotation marks omitted.) Id. With respect to the second claim, there is nothing in our law that requires exhaustion of administrative remedies prior to commencing a claim of an unconstitutional taking. Consequently, neither of these two claims has merit.