******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

SCHAGHTICOKE TRIBAL NATION *v.* STATE
OF CONNECTICUT ET AL.
(AC 43811)

Alvord, Elgo and Palmer, Js.

*Syllabus*

The plaintiff, which consists of members of the Schaghticoke tribe, an indigenous tribe recognized by the state, brought an action against the defendants, the state of Connecticut and the Commissioner of Energy and Environmental Protection, claiming an unconstitutional taking of certain of its real property and a breach of fiduciary duty. In 1752, the General Assembly enacted a resolution permitting members of the tribe to use certain land for improvement and for the cutting of wood and timber for their own use "during the pleasure of [the] Assembly." Thereafter, in 1801, the General Assembly granted a request of the state appointed overseer of the tribe for permission to sell a portion of the land in order to settle a debt incurred by the tribe, authorized a committee of sale to build several dwellings on the land and empowered the overseer to manage the proceeds and any mortgage securities obtained. The plaintiff's action, brought in 2016, alleged, inter alia, that the 1801 land sale amounted to an unconstitutional taking without just compensation under the Connecticut and United States constitutions. The plaintiff requested various measures in its prayer for relief, including monetary relief, with the aim of making tribal funds whole. The trial court granted the defendants' motion to dismiss the plaintiff's complaint, and the plaintiff appealed to this court. *Held*:

1. The trial court properly dismissed the plaintiff's takings claims with respect to the sale of the land at issue as they were barred by sovereign immunity, that court having correctly determined that the revocable right of occupancy granted to the tribe through the 1752 resolution was not tantamount to a cognizable property right under state law that could form the basis of a takings claim, as the language in that resolution did not describe the plaintiff's rights to the land as exclusive, it did not reflect a statutory waiver of the state's sovereign immunity, and the ability to use the land was granted at the pleasure of the General Assembly.

2. The trial court properly dismissed the plaintiff's breach of fiduciary duty claims, as they were barred by sovereign immunity because, although the plaintiff's prayer for relief with respect to these claims requested that the defendants take certain actions, this relief was expressly grounded in the plaintiff's requests for funds from the defendants in order to make up for the injury it alleges it suffered at the hands of the defendants, and the plaintiff failed to cite to any statute in support of its claims that entitled it to a monetary award and did not cite to any legislative materials that contained a waiver of the state's sovereign immunity regarding claims the plaintiff might have against it.

(*One judge concurring*)

Argued February 9—officially released September 27, 2022

*Procedural History*

Action to recover damages for, inter alia, the alleged unconstitutional taking of the plaintiff's property, and for other relief, brought to the Superior Court in the judicial district of Hartford, and transferred to the Complex Litigation Docket; thereafter, the court, *Moukawsher, J.*, granted the defendants' motions to dismiss and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*John R. Weikart*, with whom was *James P. Sexton*, for the appellant (plaintiff).

*Daniel Salton*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare Kindall*, solicitor general, *Matthew I. Levine*, deputy associate attorney general, and *David H. Wrinn* and *Michael W. Lynch*, assistant attorneys general, for the appellees (defendants).

*Opinion*

ELGO, J. This appeal arises out of a protracted dispute between the plaintiff, the Schaghticoke Tribal Nation, and the defendants, the state of Connecticut and Robert Klee, the Commissioner of Energy and Environmental Protection. The plaintiff claims that it is owed compensation pursuant to the state's sale of land and associated mortgages in which it claims to have a property interest, and thus filed a complaint alleging an unconstitutional taking of its property without compensation and a breach of fiduciary duty by the defendants. The trial court rendered judgment dismissing the complaint, from which the plaintiff has appealed. On appeal, the plaintiff challenges the judgment of the trial court dismissing its complaint in its entirety. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The plaintiff consists of members of the Schaghticoke tribe (tribe), an indigenous tribe recognized by the state in General Statutes § 47-59a (b). The state's relationship with the tribe dates back several centuries. In 1736, in response to the tribe's settlement of an area along the Housatonic River, the General Assembly enacted a resolution (1736 resolve) permitting the tribe to "[continue] where they are [now settled during] the [pleasure] of this [governmental body] . . . ." The General Assembly further addressed the tribe's rights with respect to that area in 1752, when it enacted another resolution (1752 resolve) permitting the tribe's use of additional land for "improvement and for the cutting of wood and timber for their own use . . . during the pleasure of this Assembly."

In 1801, the state appointed overseer of the tribe wrote to the General Assembly requesting permission to sell a portion of the tribe's land in order to settle a debt incurred by the tribe. The state granted that request and passed an instrument that established a committee of sale with respect to that land, authorized the committee to build several dwellings on the land, and empowered the overseer to manage the proceeds and any mortgage securities obtained.

More than two centuries later, on October 13, 2016, the plaintiff brought the present action by way of a six count complaint. In the first and second counts, the plaintiff alleged that the state's conduct with respect to the 1801 land sale and creation of the associated mortgages amounted to an unconstitutional taking of property without just compensation in violation of the United States and Connecticut constitutions, respectively. In the third count, the plaintiff claimed that the allegedly unconstitutional taking of its property violated its due process rights under article first, § 8, of the Connecticut constitution. The fourth through sixth counts alleged that the defendants had violated a fidu-

ciary duty to the plaintiff and requested a number of measures, including monetary relief as set forth in the fourth count, with the aim of "[making] tribal funds . . . whole."

On February 14, 2017, the defendants filed a motion to dismiss. In their accompanying memorandum of law, they argued that (1) the plaintiff lacked standing as a result of an alleged ongoing leadership dispute within the tribe and (2) the plaintiff's claims were barred by the doctrine of sovereign immunity.[1] The plaintiff filed an opposition to the motion to dismiss accompanied by a memorandum of law, arguing that it appropriately represented the interest of the tribe for standing purposes and that the defense of sovereign immunity was inapplicable to its takings, due process, and breach of fiduciary duty claims.

Following transfer of the action to the Complex Litigation Docket on July 24, 2017, the court ordered the parties to prepare a joint case management report in advance of a status conference, which they submitted to the court on August 9, 2017. In their report, the parties expressed their desire to resolve the issue of the plaintiff's standing and the applicability of General Statutes § 47-66i before considering any alternative grounds for dismissal.

The court heard argument on the standing issue on September 17, 2017. On September 19, 2017, the court denied the defendants' motion to dismiss on the ground that the plaintiff lacked standing to bring the action. The court reasoned that, regardless of whether the plaintiff consisted of the entirety of the tribe or a mere faction, the plaintiff sufficiently represented the interest of individual members of the tribe for the purposes of bringing the present action.[2]

The parties and the court next addressed the issue of whether the plaintiff's property interest in the land at issue was sufficient to survive dismissal. After several rounds of supplemental briefs and memoranda on this issue, the parties appeared for argument before the court on December 18, 2017.

On December 27, 2017, the court granted in part the defendants' motion to dismiss. Turning first to the text of the 1736 and 1752 resolves, the court determined that neither resolve contained language that would have been understood to signify a formal conveyance of a property interest at the time of their ratification. In response to the plaintiff's contention that even a mere ability to occupy the land created a property right that entitled the plaintiff to compensation following the state's sale of the land, the court undertook a similar analysis. The court observed that the resolves permitted the tribe's presence on the land "during the pleasure" of the General Assembly, meaning that "the General Assembly . . . had the right to take away" the tribe's

ability to use the land. The court further cited several cases holding that a revocable license to access land does not confer a property interest on its holder.[3]

On May 23, 2019, the plaintiff filed a motion for clarification with respect to the status of its due process and fiduciary claims against the defendants.[4] Days later, the court, sua sponte, opened the judgment "to prevent any appeal period from running during the consideration of [the plaintiff's] motion and any outstanding matters undecided."

The parties and the court then agreed on a briefing schedule for the plaintiff's remaining claims. Following the submission of briefs by the parties and oral argument before the court, the court granted the defendants' motion to dismiss as to the fiduciary claims and, accordingly, dismissed the remainder of the plaintiff's complaint. The court held that, regardless of whether sovereign immunity was fatal to the plaintiff's claims, the plaintiff had not adequately demonstrated the existence of a statutory or common-law fiduciary relationship between it and the defendants such that its claims could proceed. This appeal followed.

I

The plaintiff first claims that the court improperly dismissed its takings claim with respect to the sale of the land at issue. The plaintiff argues that the 1752 resolve created an ownership interest in the land at issue that entitles it to compensation as a result of the prior sale of the land. We disagree.

Our review of this claim is governed by the following legal principles. "The standard of review for a court's decision on a motion to dismiss is well settled. A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo. . . . When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." (Internal quotation marks omitted.) *Gold* v. *Rowland*, 296 Conn. 186, 200–201, 994 A.2d 106 (2010).

"[T]he doctrine of sovereign immunity is not available to the state as a defense to claims for just compensation arising under article first, § 11, of the Connecticut constitution. . . . When possession has been taken from the owner, he is constitutionally entitled to any damages which he may have suffered . . . ." (Internal quotation

marks omitted.) *184 Windsor Avenue, LLC* v. *State*, 274 Conn. 302, 319, 875 A.2d 498 (2005). "The complaint, to survive the defense of sovereign immunity, must allege sufficient facts to support a finding of a taking of [property] in a constitutional sense." (Internal quotation marks omitted.) *Gold* v. *Rowland*, supra, 296 Conn. 201.

"It is axiomatic that government action cannot constitute a taking when the aggrieved party does not have a property right in the affected property. Whether one's interest or entitlement rises to the level of a protected property right depends on the extent to which one has been made secure by [s]tate or [f]ederal law in its enjoyment." (Internal quotation marks omitted.) *184 Windsor Avenue, LLC* v. *State*, supra, 274 Conn. 319.

A

The plaintiff first argues that the right of occupancy conveyed to it through the 1752 resolve is tantamount to a property right under state law.[5] In support of this contention, the plaintiff relies solely on a United States Supreme Court case, *Shoshone Tribe of Indians of Wind River Reservation in Wyoming* v. *United States*, 299 U.S. 476, 496–97, 57 S. Ct. 244, 81 L. Ed. 360 (1937) (*Shoshone*), which held that the right of occupancy granted to the Shoshone tribe by the federal government constituted a compensable property interest for the purpose of assessing a taking claim under the fifth amendment to the United States constitution. We deem this reliance mistaken. On its face, *Shoshone* concerned a dispute between a federally recognized tribe and the federal government over a treaty concerning the tribe's rights with respect to the land at issue. Id., 485–86. The plaintiff offers no Connecticut authority in support of the proposition that federal precedent concerning federal tribal matters is binding on disputes between states and tribes recognized by those states.

Even if we were to consider *Shoshone* as persuasive authority, several key distinctions exist between its facts and the circumstances of the present case. In *Shoshone*, the treaty between the Shoshone and the federal government stated explicitly that the land in question "would be 'set apart for the absolute and undisturbed use and occupation of the Shoshone Indians,'" and that "no persons, except for a few specially enumerated, and governmental agents engaged in the discharge of duties enjoined by law, should 'ever be permitted to pass over, settle upon, or reside' in the territory so reserved." Id., 485–86. This language is far broader than that contained in the 1752 resolve, which merely permitted the tribe to use the land for "improvement and for the cutting of wood and timber." Notably, the 1752 resolve does not contain any language that defines the tribe's right to be present and chop wood on the land as exclusive. Furthermore, it expressly conditions the tribe's ability to use the land as existing "during the pleasure of [the General] Assembly," a limitation not

present in the treaty in *Shoshone*.

Most critically, in *Shoshone*, Congress had statutorily waived the federal government's sovereign immunity as it pertained to "any and all legal and equitable claims . . . arising under or growing out of" the particular treaty at issue between the Shoshone tribe and the federal government. *Shoshone Tribe of Indians of Wind River Reservation in Wyoming* v. *United States*, supra, 299 U.S. 484 n.1. The record before us does not reflect any such waiver on the part of the state concerning future litigation of claims arising from the 1752 resolve. For those reasons, we conclude that the plaintiff's use of *Shoshone* is an attempted shortcut around the proper sovereign immunity analysis and inapposite to our resolution of the present matter.

Indeed, the United States Supreme Court has held that, in a federal context, "Indian occupancy, not specifically recognized as ownership by action authorized by Congress, may be extinguished by the [g]overnment without compensation." *Tee-Hit-Ton Indians* v. *United States*, 348 U.S. 272, 288–89, 75 S. Ct. 313, 99 L. Ed. 314 (1955) (*Tee-Hit-Ton*). In *Tee-Hit-Ton*, a clan of Tlingit Indians brought a takings claim arising out of the federal government's sale of land that the plaintiffs previously had used for cutting timber. Id., 273. In response to the plaintiffs' assertion that their interest in the land was sufficient for the government's sale of the land to constitute a taking,[6] the federal government argued that "the [plaintiffs'] property interest, if any, is merely that of the right to the use of the land at the [g]overnment's will; that Congress has never recognized any legal interest of [the plaintiffs] in the land and therefore without such recognition no compensation is due the [plaintiffs] for any taking by the United States." Id., 277.

The United States Supreme Court first observed that the plaintiffs could not pinpoint any statutory language granting them ownership in the land at issue, which necessarily meant that the plaintiffs had "no rights against taking or extinction by the United States protected by the [f]ifth [a]mendment or any other principle of law." Id., 278, 285. The court then reviewed evidence introduced at trial before the United States Court of Claims and further acknowledged the similarities between the plaintiffs' relationship to and interactions with the land and that of the "nomadic tribes of the [lower forty-eight states]," whom the court previously had held were not entitled to compensation for government takings in the absence of formal title to the land. Id., 285–90. Accordingly, the court adhered to its established precedent concerning similar claims brought by tribes from the continental United States and held that the plaintiffs were not entitled to compensation. See id.

Although we are mindful that neither *Shoshone* nor *Tee-Hit-Ton* bears directly on disputes between tribes and individual states, we find the reasoning in *Tee-Hit-*

*Ton* more analogous to the present matter. As was the case in *Tee-Hit-Ton*, the plaintiff in the present case is unable to furnish any evidence demonstrating that it possessed an unconditional permanent right to remain on the land such that a legally cognizable property interest could arise. See id., 278–79 ("There is no particular form for congressional recognition of Indian right of permanent occupancy. It may be established in a variety of ways but there must be the definite intention by congressional action or authority to accord legal rights, *not merely permissive occupation.*" (Emphasis added.)). In our view, the principle articulated in *Tee-Hit-Ton* differentiating an ownership right from permissive occupation is consonant with our prior holdings on this issue. See, e.g., *Murphy, Inc.* v. *Remodeling, Etc., Inc.*, 62 Conn. App. 517, 522, 772 A.2d 154 ("[a] license in real property is a mere privilege to act on the land of another, which does not produce an interest in the property" (internal quotation marks omitted)), cert. denied, 256 Conn. 916, 773 A.3d 945 (2001). We therefore conclude that the court correctly determined that the plaintiff did not possess a sufficient ownership interest in the land to overcome the bar of sovereign immunity.

B

The plaintiff alternatively argues that the court misconstrued the language of the 1752 resolve in concluding that it conveyed only a revocable license—rather than a right of ownership or its equivalent—to the tribe. Our review of that issue of statutory interpretation is plenary. See *Seramonte Associates, LLC* v. *Hamden*, 202 Conn. App. 467, 476, 246 A.3d 513 ("[i]ssues of statutory construction raise questions of law, over which we exercise plenary review" (internal quotation marks omitted)), cert. granted, 336 Conn. 923, 246 A.3d 492 (2021).

"The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., 476–77.

In our view, the court properly concluded that the plain text of the 1752 resolve granted the tribe no more than a right to occupy the land which the state could revoke at any given time. As stated previously, the 1752 resolve provides: "Resolved by this Assembly, that the said Indians, the memorialists, shall have the liberty, and they have hereby liberty granted to them, for their improvement and for the cutting of wood and timber for their own use only, the whole of the twenty-fifth lot, as the lots are now laid out, and also the equal half of the twenty-fourth lot on the southward part thereof [adjoining] to such twenty-fifth lot, and this to be improved by said Indians as aforesaid during the pleasure of this Assembly." Our examination of the text of a legislative enactment is guided by the principle that, "[i]n the absence of a definition of terms in the statute itself, [w]e may presume . . . that the legislature intended [a word] to have its ordinary meaning in the English language, as gleaned from the context of its use. . . . Under such circumstances, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Jacques* v. *Commissioner of Energy & Environmental Protection*, 203 Conn. App. 419, 443, 249 A.3d 40, cert. denied, 336 Conn. 938, 249 A.3d 352 (2021).

According to the 1762 edition of Jacob's Law Dictionary, a liberty is defined as "a [privilege] held by [grant] or [prescription], by which [men] enjoy [some benefit] . . . in a more general [signification], it is [said] to be a [power] to do as one thinks fit . . . ." G. Jacob, A New Law Dictionary (8th Ed. 1762). Similarly, a license is defined as "a [power] or [authority] given to a [man] to do some lawful act . . . ." Id. In both instances, through their definitions' references to "power" and "privilege," it is clear that holding a liberty or a license relates to the ability to carry out certain actions. Conspicuously absent from either definition is a link between the term "liberty" or "license" and any concrete property rights or interests. In light of these definitions, we agree with the court's determination that the 1752 resolve merely permitted the tribe to engage in certain behaviors—being physically present on the land, chopping wood, and making "improvements" to the property.

We also find instructive Connecticut courts' interpretation of similar language throughout the years. In *Chalker* v. *Dickinson*, 1 Conn. 509, 514 (1816), our Supreme Court was tasked with evaluating a resolve permitting one Ambrose Kirkland "liberty and license . . . to use and occupy" certain land designated for fishing. (Emphasis omitted.) At the time the General Assembly enacted the resolve, a 1783 act was in effect barring the general public from fishing on the land at issue; the resolve in question essentially exempted Kirkland from the 1783 act. Id., 517. (*Gould, J.*, concurring).

Following the General Assembly's 1808 repeal of the 1783 act, the status of Kirkland's rights with respect to the fishing area was left unclear. Id., 517–18. (*Gould, J.*, concurring).

Writing for our Supreme Court, Chief Justice Zephaniah Swift first reasoned that, had the General Assembly sought to award a "new" right to Kirkland, such as "exclusive" rights to use the area, "very different language would have been proper." Id., 514. Elaborating further in his concurring opinion, Justice Gould noted that the resolve "[did] not import to grant . . . what was not before [Kirkland's] own . . . or to establish a right already vested in him." Id., 517. Justice Gould also contrasted the resolve's use of language such as " 'liberty' " and " 'license' " with "right, title, interest, franchise, or any term of similar import," suggesting that the former were "terms almost appropriate to denote a matter of mere [favor] or indulgence" as opposed to formal conferrals of rights. (Emphasis omitted.) Id.; see also *East Haven* v. *Hemingway*, 7 Conn. 186, 198 (1828) (use of "give, grant and ratify" in legislative instrument signifies bestowal of new rights rather than affirmation of preexisting rights (internal quotation marks omitted)).

After applying these principles to the 1752 resolve, we are convinced that the trial court's analysis of the text was proper. The 1752 resolve does not refer to any "right," "title," "interest," or "franchise" in the land that was to be granted to the tribe. In contrast, the resolve speaks of the tribe's status as to the land only in terms of a "liberty." We also note that, as exemplified by the resolve in *Chalker*, the General Assembly regarded (as did courts of appeal tasked with interpreting its resolves) the grant of a "liberty" and a "license" interchangeably; as noted in part I A of this opinion, this court explicitly has held that a license with respect to land "does not produce an interest in the property." *Murphy, Inc.* v. *Remodeling, Etc., Inc.*, supra, 62 Conn. App. 522.

Furthermore, it follows by implication that, by giving the tribe the ability to use the land "at the pleasure of [the General] Assembly," that ability would have been revocable at any time. See, e.g., Black's Law Dictionary (11th Ed. 2019) pp. 124–25 (defining "pleasure appointment" in public employment context as "assignment . . . that can be taken away at any time, with no requirement for cause, notice, or a hearing"). In our view, the use of such language greatly weakens any claim the plaintiff could have to a protected property right in the land. See *A. Gallo & Co.* v. *Commissioner of Environmental Protection*, 309 Conn. 810, 825, 73 A.3d 693 (2013) ("[w]hether one's interest or entitlement rises to the level of a protected property right depends upon the extent to which one has been made secure by [s]tate or [f]ederal law in its enjoyment" (internal quotation

marks omitted)), cert. denied sub nom. *A. Gallo & Co.* v. *Esty*, 572 U.S. 1028, 134 S. Ct. 1540, 188 L. Ed. 2d 581 (2014). Such a reading also is supported by the commonly held meaning of the term "license" at the time of the 1752 resolve. As the trial court emphasized in its memorandum of decision, the definition of "license" also provided that, "if [a] license was not given for a specified time it may be 'countermanded' at any time."

In light of the foregoing, we conclude that the court properly determined that the 1752 resolve did not grant the tribe a cognizable property right that could form the basis of a takings claim. As a result, the court properly concluded that the plaintiff's takings claims are barred by sovereign immunity.

## II

The plaintiff also claims that the court improperly dismissed its breach of fiduciary duty claims in counts four, five, and six for lack of standing. The plaintiff argues that several legislative acts setting forth the responsibilities of the state appointed overseer established a fiduciary relationship between the defendants and the tribe, which the defendants allegedly breached. In response, the defendants contend that the plaintiff has not properly pleaded an exception to, or waiver of, the state's sovereign immunity from suit. We agree with the defendants.

"Sovereign immunity relates to a court's subject matter jurisdiction over a case, and therefore presents a question of law over which we exercise de novo review. . . . The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under our case law. . . . Not only have we recognized the state's immunity as an entity, but [w]e have also recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state. . . .

"[T]he sovereign immunity enjoyed by the state is not absolute. There are [three] exceptions . . . . The first exception . . . occurs when the legislature, either expressly or by force of a necessary implication, statutorily waives the state's sovereign immunity; the second exception occurs when an action seeks declaratory or injunctive relief on the basis of a substantial claim that the state or one of its officers has violated the plaintiff's constitutional rights; and the third exception occurs when an action seeks declaratory or injunctive relief on the basis of a substantial allegation of wrongful conduct to promote an illegal purpose in excess of the officer's statutory authority." (Citation omitted; internal quotation marks omitted.) *Jacques* v. *Commissioner of Energy & Environmental Protection*, supra, 203 Conn. App. 429.

"[A] plaintiff who seeks to bring an action for mone-

tary damages against the state must first obtain authorization from the claims commissioner." *Miller* v. *Egan*, 265 Conn. 301, 317, 828 A.2d 549 (2003). "[T]he exception to sovereign immunity for actions in excess of statutory authority or pursuant to an unconstitutional statute, applies only to actions seeking declaratory relief or injunctive relief, not to those seeking monetary damages." Id., 321. "The principles governing statutory waivers of sovereign immunity are well established. [A] litigant that seeks to overcome the presumption of sovereign immunity [pursuant to a statutory waiver] must show that . . . the legislature, either expressly or by force of a necessary implication, statutorily waived the state's sovereign immunity . . . . In making this determination, [a court shall be guided by] the well established principle that statutes in derogation of sovereign immunity should be strictly construed. . . . [When] there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in sovereign immunity. . . . Furthermore, because such statutes are in derogation of the common law, [a]ny statutory waiver of immunity must be narrowly construed . . . and its scope must be confined strictly to the extent the statute provides." (Internal quotation marks omitted.) *Allen* v. *Commissioner of Revenue Services*, 324 Conn. 292, 299–300, 152 A.3d 488 (2016), cert. denied,      U.S.      , 137 S. Ct. 2217, 198 L. Ed. 2d 659 (2017). Our resolution of this claim is also guided by the fact that, because "sovereign immunity implicates the subject matter jurisdiction of the court"; id., 299; it may be raised at any time. See *Starboard Resources, Inc.* v. *Henry*, 196 Conn. App. 80, 88, 228 A.3d 1042 ("[a] claim that a court lacks subject matter jurisdiction may be raised at any time during the proceedings . . . including on appeal" (internal quotation marks omitted)), cert. denied, 335 Conn. 919, 213 A.3d 1170 (2020).

On our review of the pleadings, the relief sought in counts five and six of the complaint is unmistakably monetary in substance. The plaintiff's requests for accountings indicate that the plaintiff seeks to prove that the defendants failed to properly financially compensate the tribe, and, consequently, failed to uphold their fiduciary responsibilities to the tribe. This reading is further supported by the plaintiff's request that the defendants "settle [tribal] funds," which makes clear that the plaintiff expects to be compensated following the aforementioned accountings. We additionally read these requests for accountings in tandem with the plaintiff's explicit requests for $610 million in damages, which are incorporated by reference into the counts alleging a breach of fiduciary duty. This underscores the extent to which monetary compensation for the defendants' alleged failure to uphold a fiduciary duty to the plaintiff is the plaintiff's ultimate goal, were it to have prevailed on its claims.

In our view, the present case is easily distinguishable from our recent decision in *Aldin Associates Ltd. Partnership* v. *State*, 209 Conn. App. 741, 765–66, 269 A.3d 790 (2022) (*Aldin*), in which we held that a claim for monetary damages is distinct from an action for specific remedies set forth in a statute which may include monetary compensation. In *Aldin*, the monetary relief sought by the plaintiff—reimbursement from the Department of Energy and Environmental Protection for remediation of petroleum storage tanks—was explicitly provided for by statute. Id., 745–46, 765; see General Statutes § 22a-449r. Here, the statutes cited by the plaintiff in support of its claims do not entitle it to a monetary award. We therefore conclude that our reasoning in *Aldin* does not apply to the matter before us.

In its complaint, the plaintiff alleges that the defendants have wronged it; throughout the complaint, the plaintiff requests money from the state in order to make up for the injury it alleges it has suffered at the hands of the defendants. We emphasize that, even though the plaintiff's prayer for relief with respect to counts five and six requests that the defendants take certain actions, this relief is expressly grounded in the plaintiff's desire "to make tribal funds . . . whole." As this court previously has held, for purposes of sovereign immunity, our conception of the relief sought by a plaintiff is to be driven by substance and not form. See *Bloom* v. *Dept. of Labor*, 93 Conn. App. 37, 41, 888 A.2d 115 ("The mere framing of the complaint as one for declaratory judgment does not, in and of itself, make it so. . . . Although the plaintiff's action was denominated as a petition for declaratory and injunctive relief, the prayer for relief . . . [indicated] that the plaintiff ultimately is seeking money damages. . . . Therefore, because the plaintiff's claim ultimately is an action for money damages, the doctrine of sovereign immunity bars his action." (Citations omitted.)), cert. denied, 277 Conn. 912, 894 A.2d 992 (2006); see also *Daimler-Chrysler Corp.* v. *Law*, 284 Conn. 701, 723, 937 A.2d 675 (2007) (holding that request for order that defendant refund sales taxes to plaintiff "must be characterized as a claim for damages").

In light of our conclusion that the second and third exceptions to sovereign immunity for injunctive and declaratory relief do not apply, the plaintiff's only conceivable path around sovereign immunity would be a legislative waiver. Yet none of the legislative materials cited by the plaintiff contains any reference, much less one "expressly or by force of a necessary implication," to a waiver of the state's sovereign immunity regarding claims that the plaintiff might have against the defendants. Id., 720. For these reasons, we conclude that the plaintiff's fiduciary claims are barred by sovereign immunity. The trial court, therefore, properly dismissed the plaintiff's breach of fiduciary duty claims.

The judgment is affirmed.

In this opinion ALVORD, J., concurred.

[1] In support of those claims, the defendants relied on General Statutes § 47-66i (b), which provides: "A leadership dispute shall be resolved in accordance with tribal usage and practice. Upon request of a party to a dispute, the dispute may be settled by a council. Each party to the dispute shall appoint a member to the council and the parties shall jointly appoint one or two additional members provided the number of members of the council shall be an odd number. If the parties cannot agree on any joint appointment, the Governor shall appoint any such member who shall be a person knowledgeable in Indian affairs. The decision of the council shall be final on substantive issues. An appeal may be taken to the Superior Court to determine if provisions of the written description filed with the Secretary of the State pursuant to this section have been followed. If the court finds that the dispute was not resolved in accordance with the provisions of the written description, it shall remand the matter with instructions to reinstitute proceedings, in accordance with such provisions."

[2] On October 3, 2017, the defendants filed a motion to reargue the standing issue, which the court denied.

[3] The parties and the court also addressed the issue of whether the plaintiff's takings claim encompassed any mortgages which the state had obtained in relation to its sale of the land at issue. After ordering jurisdictional discovery and hearing argument from the parties, the court dismissed the plaintiff's takings claims with respect to the mortgages. On appeal, the plaintiff does not challenge the propriety of the court's determination that it lacked a property interest in such mortgages.

[4] That motion was predicated on the fact that the court concluded its third memorandum of decision with the sentence "[j]udgment will enter for the defendants," despite the fact that the court had not yet ruled on the plaintiff's remaining claims.

[5] Although the plaintiff relied on both the 1736 resolve and the 1752 resolve at trial, on appeal it predicates its takings claim solely on the 1752 resolve.

[6] The resolution providing for the sale of the land contained the following provision: "Nothing in this resolution shall be construed as recognizing or denying the validity of any claims of . . . rights to lands or timber within the exterior boundaries of the [land at issue]." (Internal quotation marks omitted.) *Tee-Hit-Ton Indians* v. *United States*, supra, 348 U.S. 276.